Rose BORDANARO, et al.,
Plaintiffs, Appellees,

v.

John McLEOD, et al., Defendants,

Appeal of CITY OF EVERETT, Edward
Connolly, and Donald Bontempo,
Defendants, Appellants.

No. 88–1563.

United States Court of Appeals,
First Circuit.

Heard Nov. 2, 1988.

Decided March 30, 1989.

As Amended April 5, 1989.

Ira H. Zaleznik with whom Lewin & Rosenthal, Boston, Mass., was on brief, for defendants, appellants.

Juliane Balliro with whom Joseph J. Balliro, Balliro, Mondano & Balliro, Boston, Mass., Martin K. Leppo, Anthony Traini,

Leppo & Traini, Randolph, Mass., Frank Mondano and J. James Balliro, Jr., Boston, Mass., were on brief, for plaintiffs, appellees.

Before BOWNES and BREYER, Circuit Judges, and CAFFREY,* Senior District Judge.

BOWNES, Circuit Judge.

This appeal arises out of brutal beatings that plaintiffs-appellees received at the hands of Everett, Massachusetts police officers. Those injured and the estate of a person killed in the attack were awarded substantial verdicts[1] in their actions based upon 42 U.S.C. § 1983 and the Massachusetts Tort Claims Act. The defendants-appellants—the City of Everett, its Mayor, and its Chief of Police—appeal, alleging numerous errors of law and mistakes of fact.

We affirm the verdicts but remand for a reassessment of attorneys' fees.

## I. THE FACTS

We state the facts, as we must, in the light most favorable to the plaintiffs. *See Robinson v. Watts Detective Agency,* 685 F.2d 729, 732 (1st Cir.1982), *cert. denied,* 459 U.S. 1105, 103 S.Ct. 728, 74 L.Ed.2d 953 (1983). In the early morning hours of July 23, 1982, Everett policeman, John McLeod, who was off duty, escorted Beverly Ferrairo to a bar located inside the King Arthur Motel in Chelsea, Massachusetts. An altercation soon began between McLeod and plaintiff Alfred "Da" Mattuchio. As McLeod was about to land the first punch against Mattuchio, Charles Dimino intervened and fisticuffs ensued between Dimino and McLeod. Dimino proved the better pugilist and McLeod, beaten and bloody, was thrown out of the bar.

McLeod then went to a nearby security hut and had the attendant call the Everett Police Department for reinforcements. At the Everett station house, Lieutenant Baker and Sergeant Ferullo listened on the radio as the entire night watch of the Everett Police Department—five officers—reported that they were en route to aid McLeod. The Chelsea Police Department also responded and sent officers to the scene.

When these officers arrived, McLeod took a set of nunchaku[2] from the trunk of one of the cruisers and joined the other officers as they moved toward the King Arthur Motel in force.

As the police approached the locked glass doors of the motel, the plaintiffs, all patrons of the bar, viewed them with apprehension. The officers shouted threats to the plaintiffs and demanded entry. Before the manager could open the doors, the police shattered the glass with their nightsticks. Fearing for the safety of the plaintiffs, the manager sent them upstairs to Room 209, while he went to unlock the doors. Once the doors had been opened, the police rushed into the motel and mounted the stairs in pursuit of the plaintiffs.

The owner of the King Arthur Motel, Arthur Guttardaro, and the manager followed the police up to Room 209. The police began banging on the door with their nightsticks, threatening to kill the occupants of the room. Guttardaro and the manager offered to open the door with a pass key. Instead of accepting their offer, Officers McLeod, Macauda and Aiello assaulted and beat Guttardaro and the manager. Both men managed to drag themselves to safety despite suffering injuries.

The police officers were armed with nightsticks, clubs, bats, tire-irons, and a fire axe, in addition to their service revolvers. They banged repeatedly on the door, demanding entry and continuing to threaten the plaintiffs. A hole was hastily drilled

---

* Of the District of Massachusetts, sitting by designation.

1. The total award was approximately $3,488,356 in compensatory damages and $819,983 in punitive damages.

2. " 'Nunchaku', also known as 'nunchucks', is an Oriental martial arts weapon comprised of two pieces of wood or steel connected by a cord or chain which can be held in the hands. It had its origin as a farm implement in Okinawa." *United States v. George,* 778 F.2d 556, 558 n. 1 (10th Cir.1988).

in the door through which mace was injected into the room. Soon thereafter, Officer McClusky fired two shots from his pistol through the door.

When the door gave way, the armed force of officers entered the room. They then savagely beat the heads and bodies of the unarmed plaintiffs until most were reduced to an unconscious or semi-conscious state. McLeod repeatedly slammed Vincent Bordanaro's head against the wall and clubbed the other plaintiffs with a bat, all the while stating again and again, "Remember my name, John McLeod, don't forget it."

At some point before the door caved in, Sergeant Ferullo arrived at the entrance to Room 209. He stayed near the doorway a few moments after the door had been forced open, then left saying, "Frig this. I'm going downstairs."

Most of the persons in Room 209 sustained severe injuries. Vincent Bordanaro died as a result of the repeated blows to his head.

## II. PROCEEDINGS BELOW

The plaintiffs are: Vincent Bordanaro (through the administratrix of his estate, his widow, Rose Bordanaro), Alfred J. Mattuchio, Anthony Dimino, Nicholas Medugno, Charles Cella, Charles Tardivo, Arthur Guttadaro, Mark Eldridge, Franci Felisi, Pamela Rickards, Beverly Ferraro, Patricia Dimino, and Helen Bozzi [hereinafter plaintiffs or appellees]. Plaintiffs brought suit against a number of individual police officers, the Cities of Chelsea and Everett, their two Chiefs of Police and their two Mayors under the Civil Rights Act, 42 U.S.C. § 1983 and the Massachusetts Tort Claims Act, Mass.Gen. Laws Ann. ch. 258, § 2 (West 1988). The Mayors and the Chiefs of Police were sued individually and in their official capacities. Five individual officers defaulted;[3] the City of Chelsea and the plaintiffs entered into a settlement agreement.

The jury returned a verdict against Everett, its Mayor (Edward Connolly) and its Chief of Police (Donald Bontempo) [hereinafter defendants, appellants, or Everett]. Following the trial the district judge awarded attorneys' fees to the plaintiffs as prevailing parties under 42 U.S.C. § 1988. The defendants' motions for judgment notwithstanding the verdict or for a new trial, were denied. The defendants then timely filed their motions of appeal.

Appellants allege the following grounds for reversal: (1) the evidence was insufficient as a matter of law to find either the municipality or its supervisory officials liable under § 1983; (2) the trial judge's instructions on causation misled the jury and set too low a standard on which to assess liability under § 1983; (3) the evidence was insufficient as a matter of law to hold Everett liable under the Massachusetts Tort Claims Act; (4) the trial judge erroneously admitted prejudicial evidence of events that took place after the incident in question in violation of Fed.R.Evid. 403; and (5) the trial judge erred in his assessment of attorneys' fees to the plaintiffs. We deal with each of these contentions in turn.

## III. MUNICIPAL AND SUPERVISORY LIABILITY UNDER 42 U.S.C. § 1983

The standard to be used in reviewing a denial of a motion for judgment notwithstanding the verdict is well established. We cannot determine credibility, resolve conflicting testimony, or evaluate the weight of the evidence. Judgment n.o.v. should be granted only when the evidence could lead reasonable men to but one conclusion. *Fishman v. Clancy*, 763 F.2d 485, 486 (1st Cir.1985); *Cazzola v. Codman & Shurtleff, Inc.*, 751 F.2d 53, 54 (1st Cir.1984); *Rios v. Empresas Lineas Maritimas Argentinas*, 575 F.2d 986, 989 (1st Cir.1978). And our review of the evidence and inferences fairly drawn therefrom must be made in the light most favorable to the prevailing

---

**3.** The individual Everett officers were John McLeod, John Macauda, Richard Aiello, William McClusky and Patrick McFeeley. Sergeant Ferullo was also a defendant in the plaintiffs' § 1983 cause of action but was found not liable by the jury.

party. *Robinson v. Watts Detective Agency, Inc.*, 685 F.2d 729, 732 (1st Cir. 1982), *cert. denied,* 459 U.S. 1105 [103 S.Ct. 728, 74 L.Ed.2d 953] (1983); *DeVasto v. Faherty,* 658 F.2d 859, 861 (1st Cir.1981).

*Wildman v. Lerner Stores Corp.*, 771 F.2d 605, 607 (1st Cir.1985); *see Wierstak v. Heffernan,* 789 F.2d 968, 973 (1st Cir.1986); *Kibbe v. City of Springfield,* 777 F.2d 801, 806–07 (1st Cir.1985), *cert. granted,* 475 U.S. 1064, 106 S.Ct. 1374, 89 L.Ed.2d 600 (1986), *cert. dismissed as improvidently granted,* 480 U.S. 257, 107 S.Ct. 1114, 94 L.Ed.2d 293 (1987). It is these principles that control our review of the record.

In *Monell v. New York City Dep't of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court determined in what circumstances a municipality could be held liable under § 1983 for deprivations of constitutional rights suffered at the hands of municipal employees. It held that:

> a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory.
>
> \*   \*   \*   \*   \*   \*
>
> Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Id.* at 691, 694, 98 S.Ct. at 2036, 2037 (emphasis in the original). Holding the city liable only if the injury results from an officially sanctioned policy or custom, exempts the municipality from responsibility for the aberrant and unpredictable behavior of its employees while making it liable for acts and conduct rightly attributable to the city. *See City of Canton v. Harris,* — U.S. —, — – —, 109 S.Ct. 1197,

1202–06, 103 L.Ed.2d 412 (1989); *City of St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988); *Pembaur v. City of Cincinnati,* 475 U.S. 469, 479–81, 106 S.Ct. 1292, 1298–99, 89 L.Ed.2d 452 (1986); *Oklahoma City v. Tuttle,* 471 U.S. 808, 817–18, 821, 105 S.Ct. 2427, 2432–33, 2435, 85 L.Ed.2d 791 (1985); *id.* 436 U.S. at 691–94, 98 S.Ct. at 2036–37.

In the instant case, the jury was presented with two alternative theories for finding that the plaintiffs' injuries [4] were caused by a "policy or custom" of the City of Everett. First, the plaintiffs asserted that their injuries were the direct result of an unconstitutional police department custom of breaking down doors without a warrant whenever its officers were apprehending a felon. Second, the plaintiffs maintained that their injuries had been caused by a custom or policy of gross negligence amounting to deliberate indifference in the recruitment, training, supervision or discipline of Everett's police officers. We address each of these arguments.

A. *Municipal Liability Based on an Unconstitutional Custom*

> Section 1983 provides that any person who, under color of any ... *custom or usage,* of any State or Territory ... *subjects, or causes to be subjected,* any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983 (emphasis added). In defining the parameters of the terms "custom" and "usage," the Court has instructed that:

> "Congress included customs and usages [in § 1983] because of the persistent and wide-spread discriminatory practices of state officials.... Although not authorized by written law, such practices of

---

**4.** This circuit has recognized that the use of excessive or unreasonable force or violence by law enforcement personnel resulting in personal injury deprives a person of liberty without due process of law in violation of the fourteenth

amendment. *Voutour v. Vitale,* 761 F.2d 812, 818 (1st Cir.1985) (citing *Landrigan v. City of Warwick,* 628 F.2d 736, 741–42 (1st Cir.1980)), *cert. denied,* 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 916 (1986).

state officials could well be so permanent and well settled as to constitute 'custom or usage' with the force of law." *Monell*, 436 U.S. at 691, 98 S.Ct. at 2036 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 169–70, 90 S.Ct. 1598, 1614–15, 26 L.Ed.2d 142 (1970)); *see Praprotnik*, 108 S.Ct. at 925–26.

▮ Following this teaching, courts have established two requirements for plaintiffs to meet in maintaining a § 1983 action grounded upon an unconstitutional municipal custom. First, the custom or practice must be attributable to the municipality. In other words, it must be so well-settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice. *See Spell v. McDaniel*, 824 F.2d 1380, 1386–88 (4th Cir.), *cert. denied,* ⸺ U.S. ⸺, 108 S.Ct. 752, 98 L.Ed.2d 765 (1988); *see also Praprotnik*, 108 S.Ct. at 925–26; *Tuttle*, 471 U.S. at 818–20, 105 S.Ct. at 2433–35; *Voutour v. Vitale*, 761 F.2d 812, 820 (1st Cir.1985), *cert. denied*, 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 916 (1986). Second, the custom must have been the cause of and the moving force behind the deprivation of constitutional rights. *See Tuttle*, 471 U.S. at 819, 105 S.Ct. at 2434; *Monell*, 436 U.S. at 694–95, 98 S.Ct. at 2037–38; *Kibbe*, 777 F.2d at 809–10; *see also City of Canton,* ⸺ U.S. at ⸺, 109 S.Ct. at 1206; Annotation, *What Constitutes Policy or Custom for Purposes of Determining Liability of Local Government Unit under 42 U.S.C. § 1983—Modern Cases*, 81 A.L.R.Fed. 549, 561–66, 571–83 (1987) (collecting and assessing various municipal policy/custom cases) [hereinafter Annotation, *§ 1983*]. We believe the evidence, when viewed in plaintiffs' favor, meets both requirements.

1. *Existence of the Custom.* Testimonial evidence from Sergeant Ferullo showed that the Everett Police Department had a longstanding, wide-spread, and facially unconstitutional practice of breaking down doors without a warrant when arresting a felon. Based upon his uncontroverted testimony and inferences reasonably drawn therefrom, the jury could have found that:

—The sergeant had been present at either "about 20 or 30" or "50, 60" situations involving door breakdowns over his 24-year tenure as a police officer.

—A 12–pound sledge hammer was provided by the City of Everett for use in breaking down doors.

—Numerous occasions in which doors were broken down by Everett officers involved the unconstitutional practice of breaking down doors without a warrant when attempting to arrest a felon. When asked whether this type of force was used by the Everett Police in effecting arrests the sergeant stated: "[Y]es, that's the way we've always applied it."

—The scenario at the King Arthur Motel appeared no different that any of the previous breakdowns made over the years.

—In breaking down the door at the King Arthur Motel, the officers were following what had been accepted departmental practice in the past.

This uncontradicted version of the arrest practice that was employed by the Everett Police Department proved that such an unconstitutional custom was "'the way things [were] done and [had] been done'" in the City of Everett. *Kibbe*, 777 F.2d at 806 (quoting *Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir.1985), *cert. denied*, 480 U.S. 916, 107 S.Ct. 1369, 94 L.Ed. 2d 686 (1987)).

▮ Additional support for the existence of such a practice can be inferred from the event itself. This incident involved the joint actions of the entire night watch of the Everett Police Department. A reasonable inference to draw from this is that all of the officers involved were operating under a shared set of rules and customs. The fact that all of these officers acted in concert is further evidence that there was a pre-existing practice of breaking down doors when apprehending felons. Absent such a norm, it is highly unlikely such unanimity of action could occur. While it is true that evidence of a single event alone cannot establish a municipal custom or poli-

cy, *see, e.g., Tuttle,* 471 U.S. at 823–24, 105 S.Ct. at 2436–37 (opinion of Rehnquist, J.), where other evidence of the policy has been presented and the "single incident" in question involves the concerted action of a large contingent of individual municipal employees, the event itself provides some proof of the existence of the underlying policy or custom.[5] *See Kibbe,* 777 F.2d at 805–06; *Grandstaff,* 767 F.2d at 171–72; Annotation, *§ 1983,* 81 A.L.R.Fed. 549, 569–70 (1987).

■  2. *Attribution to the Municipality.* Although there was no direct evidence that the Chief of Police had actual knowledge of this policy of breaking down doors without a warrant, the evidence does support a finding of his constructive knowledge of it. Constructive knowledge "may be evidenced by the fact that the practices have been so widespread or flagrant that in the proper exercise of [their] official responsibilities the [municipal policymakers] should have known of them." *Spell v. McDaniel,* 824 F.2d at 1387; *see Voutour,* 761 F.2d at 820; *Webster v. City of Houston,* 735 F.2d 838, 842 (5th Cir.1984) (en banc); *Bennett v. City of Slidell,* 728 F.2d 762, 768 (5th Cir.1984), *cert. denied,* 472 U.S. 1016, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985).

The evidence is sufficient to prove that the Chief should have known of the unconstitutional arrest practice. The Chief's own testimony and that of others was that he oversaw the operations of the department and set much of its policy. The evidence showed that the Chief utilized an extensive report review process to monitor the conduct of his officers and to ensure their compliance with the rules of the department. Such a review process would alert the Chief to practices that transgressed department policy. Knowledge of the practice may thus be imputed to the Chief. And allowing this custom to continue amounted to a deliberate indifference to the rights of the citizens of Everett, making a constitutional violation " 'almost

bound to happen, sooner or later.' " *Spell,* 824 F.2d at 1391; *see also City of Canton v. Harris,* —— U.S. at ——, 109 S.Ct. at 1205. In this case, the jury could conclude that there was "supervisory encouragement, condonation and even acquiescence" in the unconstitutional practice. *Voutour,* 761 F.2d at 820 (noting absence of supervisory acquiescence in that case). Chief Bontempo's failure to eradicate this facially unconstitutional practice from the police department attributes that custom to the municipality.

Everett's contention that the Chief of Police cannot be considered a policymaker for the police department is unavailing. Testimony from the Chief and Mayor Connolly established that, in regard to law enforcement decisions, the Chief was one "whose acts or edicts may fairly be said to represent official policy." *Monell,* 436 U.S. at 694, 98 S.Ct. at 2037; *see City of St. Louis v. Praprotnik,* 108 S.Ct. at 924–28; *Pembaur v. City of Cincinnati,* 475 U.S. at 480–81, 106 S.Ct. at 1298–99; *see also Spell,* 824 F.2d at 1394–95.

3. *The Causal Link.* The Supreme Court has declared that to support liability under § 1983, a municipal custom must have been the "moving force" behind the plaintiff's injury. *See Tuttle,* 471 U.S. at 819, 105 S.Ct. at 2434; *Monell,* 436 U.S. at 694–95, 98 S.Ct. at 2037–38; *Polk County v. Dodson,* 454 U.S. 312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981); *Milligan v. City of Newport News,* 743 F.2d 227, 230 (4th Cir.1984). There must be some "affirmative link" between the municipal custom and the constitutional deprivation. *See Tuttle,* 471 U.S. at 824–25 & n. 8, 105 S.Ct. at 2436–37 & n. 8 (opinion of Rehnquist, J.); *Kibbe,* 777 F.2d at 808; *Voutour,* 761 F.2d at 819–20; *see also City of Canton,* —— U.S. at ——, 109 S.Ct. at 1206. Everett argues that there is no evidence that the officers were following the alleged custom on the night of July 22–23, 1982. It contends that the police were not appre-

---

**5.** We are mindful of the difficulty plaintiffs encounter in proving the existence of such police department policies and customs. Plaintiffs are likely to encounter hostile witnesses and incom-

plete documentation of past abuses. *See Grandstaff v. City of Borger,* 767 F.2d 161, 171 (5th Cir.1985), *cert. denied,* 480 U.S. 916, 107 S.Ct. 1369, 94 L.Ed.2d 686 (1987).

hending felons but, rather, were seeking revenge. We disagree.

Testimony from a number of sources indicated that the officers were in the process of arresting one or more felons. Most importantly, Sergeant Ferullo testified that the officers on the scene had told him they were in the process of apprehending and arresting certain individuals and, later, that he was told arrests were made. Moreover, as Sergeant Ferullo noted, the breaking down of the door at the King Arthur Motel was no different from previous cases, in that all involved situations where doors had been broken down to apprehend felons. The officers were, therefore, following regular police practice.

The jury could reasonably have concluded that the plaintiffs' injuries occurred as a direct and immediate consequence of this unconstitutional municipal custom. Everett's arrest practice was both affirmatively linked to and the moving force behind the plaintiffs' constitutional deprivations. If a *constitutional* practice of arrest had been the accepted norm in the Everett Police Department, the officers would have been forced to obtain a warrant before entering Room 209. The additional cooling-off time that this would have afforded and the imposition of an impartial judicial officer's assessment of the situation would have greatly reduced, if not totally removed, the likelihood of any police overzealousness in this case. Indeed, this is one of the underlying reasons for the warrant requirement. *See* 2 W. LaFave, *Search and Seizure*, § 4.1 (1987) and cases cited therein. Under the existing practice, however, the officers knew they could knock down the door to Room 209 and reach the persons inside without violating department policy. The jury's conclusion that this custom caused the plaintiffs' injuries is thus amply supported by the record.[6]

In sum, a well-settled, unconstitutional practice of breaking down doors without

warrants existed in Everett as of July 22–23, 1982. The Chief of Police had constructive knowledge of this custom yet did nothing to stop the practice. This made it almost inevitable that a constitutional injury would be suffered by some future party. The custom was the moving force behind and the cause of the violation in this case. Therefore, the jury's imposition of § 1983 liability on Everett based upon this unconstitutional custom is affirmed.

B. *Municipal Liability Based on a Deficient Custom or Policy in the Recruitment, Training, Supervision or Discipline of Everett Police Officers*

■ The City was also found liable under § 1983 for having a policy of inadequate recruitment, training, supervision or discipline of its police officers. The jury found that this policy evidenced gross negligence amounting to deliberate indifference to the constitutional rights of those with whom the police would come into contact. Everett now argues that the evidence was insufficient as a matter of law to support this finding. We disagree.

After the case at bar had been decided below, the Supreme Court issued its decision in *City of Canton v. Harris,* —— U.S. ——, 109 S.Ct. 1197. The issue presented to the Court in that case was whether a municipality could be held liable under § 1983 "for constitutional violations resulting from its failure to train municipal employees." *City of Canton,* at ——, 109 S.Ct. at 1199. The Court held that "only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." At ——, 109 S.Ct. at 1205.

The Court then addressed what type of evidence was necessary to establish such deliberate indifference. It stated:

---

**6.** This scenario is in sharp contrast to the cases cited by the defendants where the causal link between the policy alleged and the constitutional injury was tenuous at best. *See Martinez v. California,* 444 U.S. 277, 285, 100 S.Ct. 553, 559, 62 L.Ed.2d 481 (1980) (no § 1983 liability where

state released individuals from custody who subsequently injured third parties); *Estate of Gilmore v. Buckley,* 787 F.2d 714, 720 n. 10 (1st Cir.) (same), *cert. denied,* 479 U.S. 882, 107 S.Ct. 270, 93 L.Ed.2d 247 (1986).

*Monell*'s rule that a city is not liable under § 1983 unless a municipal policy causes a constitutional deprivation will not be satisfied by merely alleging that the existing training program for a class of employees, such as police officers, represents a policy for which the city is responsible. That much may be true. The issue in a case like this one, however, is whether that training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent "city policy." It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program. See *Springfield v. Kibbe*, 480 U.S. at 268 [107 S.Ct. at 1120] (O'Connor, J., dissenting); *Oklahoma City v. Tuttle*, [471 U.S.] at 821 [105 S.Ct. at 2435] (opinion of Rehnquist, J.). It may be, for example, that an otherwise sound program has occasionally been negligently administered. Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had

better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal. And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.

— U.S. at ——-——, 109 S.Ct. at 1205.

With these teachings in mind, we address the question of whether the evidence presented at trial was sufficient to prove that Everett officials were deliberately indifferent to the need for better recruitment, training, supervision and discipline of the city's police force.

1. *The Existence of the Policy.* The evidence adduced at trial supports the finding that the City of Everett failed to provide minimally acceptable standards of recruitment, training, supervision or discipline of its police force. In the instant action, the jury was not asked to infer the existence of this policy based solely on the incident at the King Arthur Motel. "Rather, there was direct evidence presented to the jury of the City of [Everett's] failure to train and supervise its officers in a number of key areas of law enforcement and of its indifference to the circumstances of [the plaintiffs' beatings]." *Wierstak*, 789 F.2d at 975.

The evidence on this issue and reasonable inferences to be drawn from it was as follows:

—The City of Everett was operating under a set of rules and regulations promulgated in 1951 and last distributed to the officers in the mid-sixties. The Rules and Regulations of the Everett Police Department [hereinafter Rules and Regulations], which comprised the day-to-day guidelines for the department,[7] failed to address con-

---

**7.** While there was some evidence that the Everett police department was also governed through a document known as the Police Manual for the Police Department of the City of Everett, the jury may reasonably have concluded from the evidence that the Rules and Regula-

temporary law enforcement issues and lacked sufficient detail to serve as the operating directives of a modern police force. Specifically, they failed to address up-to-date standards governing search and seizure, hot pursuit and the use of deadly force. Reiter, the plaintiffs' expert on police procedures, testified that these regulations were deficient in almost every way.

—Aside from emergency medical instruction, Everett officers received little or no formal training after completing their initial police academy courses. The officers thus lacked up-to-date direction in many police procedures, including the proper use of force.

—The City of Everett discouraged officers from seeking out supplementary training courses.

—Reiter testified as to the necessity and importance of establishing mandatory and current training for all members of a municipal police force.

—Massachusetts state law provided that police officers who enrolled in college law enforcement courses were to receive increased monetary benefits from their employers. The police officers of Everett were forced to sue the city to compel it to provide these benefits.

—There was no supervisory or command training required upon promotion to a higher rank. Supervisory officers, therefore, lacked the basic training due all officers *and* the command training necessary to effectively supervise and operate a police force.

—Since few rules or guideposts for conduct were in force, the organization of the police department placed too much discretion at all operating levels.

—Background checks of prospective officers, which Reiter testified to be the best indication of future performance, were superficial, at best, and failed to reach minimal levels of acceptability. In particular, psychological examinations, which a city ordinance required be given to all police officers, were often not performed.

—The Chief of Police failed to make written, monthly reports to the Mayor concerning the department, as was required by city ordinance. Reiter testified that the Chief's oral discussions with the Mayor could not substitute for written, in depth reports on the activities of the department.

—In the past, discipline had been meted out haphazardly, inconsistently, and infrequently to Everett officers.

—No disciplinary actions were instituted against the officers involved in this incident until over one month after the episode. A number of the officers were then suspended, because they had been indicted by the Suffolk County District Attorney.

—A full, *internal* investigation by the Everett Police Department did not occur until over one year after the King Arthur incident.

—Sergeant Ferullo received a short suspension as a result of this investigation. His suspension was subsequently overturned on appeal based, in part, on the fact that he had received inadequate supervisory training to be a police sergeant.

—Reiter testified that the Chief's review of civil grievances filed against Everett officers for their misconduct fell well below accepted levels. Indeed, many complaints were placed in a dead letter drawer never to be seen again.

—In a 1983 letter concerning an officer's misconduct, the Chief wrote: "Gone are the days when accountability is scoffed at." From this statement, it might reasonably be inferred that Everett officials had given little attention to instances of police misconduct in the past.

—The Chief and the Mayor had received oral and written requests for better training and organizational improvements prior to the incident at King Arthur. They were aware of the issue, discussed it, and decided to institute no additional training programs. Later requests for better training by Everett police officers were ignored.

—Prior to the incident at the King Arthur Motel, Lieutenant Stewart, the main advocate for better training and guidance

tions of the Everett Police Department were the only regulations in force as of July 22–23, 1982.

among the Everett officers, told both the Mayor and the Chief that something bad would happen if more instruction were not provided to the police force.

---

In addition to the evidence outlined above, we believe that the jury could have considered the incident itself in determining what type of recruitment, training, supervision and discipline were given to Everett police officers. As with the unconstitutional custom of breaking down doors discussed, *supra*, there is independent evidence concerning the police department policy. The incident involved a series of interrelated acts of assault carried out by individual police officers. This, combined with the fact that there was other, independent evidence regarding police department policy, makes the police conduct at the motel evidence directly bearing on the officers' recruitment, training, supervision and discipline.[8] It is reasonable to infer from what happened that these police officers received the same training and supervision and had similar understandings about whether they would be subject to discipline for their actions. *See Kibbe*, 777 F.2d at 805–06; *Grandstaff*, 767 F.2d at 171–72; Annotation, *§ 1983*, 81 A.L.R.Fed. 549, 569–70 (1987).

Based upon all the foregoing, the jury was well within its discretion in finding that the recruitment, training, supervision or discipline of Everett police officers was grossly and flagrantly deficient.

2. *Attribution to the Municipality.* In addition to proving the great inadequacies in the recruitment, training, supervision or discipline of Everett police officers, plaintiffs must also establish that municipal officials charged with the responsibility of making policy for the police department were "deliberately indifferent" to these failings. *See City of Canton*, —— U.S. at ——, 109 S.Ct. at 1204–05. Only if there were such deliberate indifference could the

municipality be held liable under § 1983. *See id.; Voutour*, 761 F.2d at 821–22; *see also Spell*, 824 F.2d at 1387. We believe plaintiffs have carried this burden.

Evidence was presented that the Chief of Police, and ultimately the Mayor of Everett, were responsible for the recruitment, training, supervision and discipline of the Everett police force. There was testimony by the Chief that, although the Mayor as Chief Executive Officer of the city held the paramount authority, the creation of policy and the day-to-day functioning of the department was left to the Chief of Police. The Mayor agreed with this and testified that the Chief was the department head but that he, the Mayor, was informed daily as to the actions of the police department and was the decisionmaker on many important issues. Moreover, the Rules and Regulations imply such a coupling of responsibility between the Chief of Police and the Mayor. The jury could have reasonably concluded, then, that both of these men were ones "whose acts or edicts may fairly be said to represent official policy." *Monell*, 436 U.S. at 694, 98 S.Ct. at 2037; *see Praprotnik*, 108 S.Ct. at 924–28; *Pembaur*, 475 U.S. at 480–81, 106 S.Ct. at 1298–99. They were the policymakers for the city regarding law enforcement matters.

Based on the following evidence the jury could have found that both the Chief and the Mayor had express knowledge of the lack of any effective policy for the recruitment, training, supervision or discipline of Everett police officers:

—Each had received complaints from Everett officers concerning inadequate police training and the dangers that this presented to civilians. The issue and its consequences were discussed by the Mayor and the Chief. They determined that no more training would be provided.

—Everett officers who sought out further training were affirmatively discouraged from doing so.

---

8. We note that a "single incident" of misconduct, without other evidence, cannot provide the basis for municipal liability under § 1983. Such a result would be the equivalent of imposing *respondeat superior* liability upon the mu-

nicipality. *See Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24, 105 S.Ct. 2427, 2436–37, 85 L.Ed.2d 791 (1985); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 923–24, 99 L.Ed.2d 107 (1988).

—The testimony of the Mayor and the Chief indicate clearly that they knew that there was no mandatory training required of Everett patrolmen or supervisory officers, aside from emergency medical instruction and police academy training.

—The Mayor had been sued by Everett police officers to force him to pay the monetary benefits due them under a state law that compelled municipalities to give economic incentives to police officers who voluntarily take college-level law enforcement courses.

—Both men had the responsibility for overseeing the department and the discipline of its officers. The Mayor and the Chief were aware of the acts perpetrated at the King Arthur Motel yet chose to take no disciplinary actions against the officers until they had been indicted.

---

The jury had solid evidentiary grounds for finding that the failure of the Mayor and the Chief of Police to institute a minimally acceptable program of recruitment, training, supervision or discipline amounted to a deliberate indifference to the constitutional rights of the city's inhabitants. *See City of Canton,* — U.S. at ——, 109 S.Ct. at 1206. The consequence of this policy was that the Everett police force was ill-prepared and ill-equipped to perform the obvious and recurring duties of police officers. *See id.,* at —— – ——, 109 S.Ct. at 1205–06; *id.* at ——, 109 S.Ct. at 1208 (O'Connor, J., concurring in part and dissenting in part). The "do nothing policy" of the Mayor and the Chief exposed the citizens of Everett to imminent police misconduct, and was attributable to the municipality. *See id.* at —— – ——, 109 S.Ct. at 1204–05.

3. *The Causal Link.* In order to hold the city liable for their injuries under § 1983, the plaintiffs must also establish that there was a direct causal connection between the policy of inadequate recruitment, training, supervision or discipline and the deprivations of their constitutional rights. This connection needs to rise above a mere but/for coupling between cause and effect, *see City of Canton,* at —— – ——, 109 S.Ct. at 1204–05; *Tuttle,* 471 U.S. at 823, 105 S.Ct. at 2436 (opinion of Rehnquist, J.); for "[i]n every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident. *See Oklahoma City v. Tuttle, supra,* 471 U.S. at 823, 105 S.Ct. at 2436 (opinion of Rehnquist, J.)." *City of Canton,* — U.S. at ——, 109 S.Ct. at 1205. To form the basis for liability under § 1983, a municipal policy must be affirmatively linked to and the moving force behind the constitutional violation. *See Monell,* 436 U.S. at 694, 98 S.Ct. at 2037; *Polk County v. Dodson,* 454 U.S. 312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981). *See also id.* The evidence was sufficient to prove such a causal connection.

The jury could have found that the failure of the entire night watch of the Everett Police Department to act at even minimally acceptable levels of police conduct was directly linked to the city's policy of deficient recruitment, training, supervision and discipline of its police force. The Rules and Regulations contained no information, and the Everett officers were given no up-to-date training on, the use of force—deadly or otherwise—hot pursuit, or search and seizure. The lack of proper training on these essential elements of law enforcement led directly to the constitutional violations at the King Arthur Motel. Due to the inadequacy of his supervisory training, Sergeant Ferullo abdicated his responsibility to the plaintiffs and left a volatile scene that demanded control by a supervisory officer. The absence of a strictly enforced disciplinary system led the officers at the King Arthur Motel to believe they were above the law and would not be sanctioned for their misconduct.[9] A sufficiently supervised, properly recruited, trained and disciplined group of officers would not

---

9. Indeed, a full investigation of this event did not occur until a year after the event. Officer

McKlusky was never disciplined for the discharge of his service revolver into Room 209.

have acted so far below the level of accepted police behavior.

Based on all the foregoing, we affirm both the jury's finding that the plaintiffs' injuries were caused by a policy of the City of Everett and its imposition of § 1983 liability on the city. We point out that liability is levied here not because the city hired "one 'bad apple,' " *see Tuttle*, 471 U.S. at 821, 105 S.Ct. at 2435, but because the city's police policy produced an entire barrel of bad apples.

### C. *Supervisory Liability of Mayor Connolly and Chief Bontempo*

■ Everett argues that the evidence was insufficient to impose punitive damages against Mayor Connolly and Chief Bontempo.[10] It asserts that there was no evidence which could support a finding that either the Mayor or the Chief acted with "evil motive or intent, or ... reckless or callous indifference to the federally protected rights of others" in running the Everett Police Department. *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983). *See Germany v. Vance*, 868 F.2d 9, 20 (1st Cir.1989). We disagree. Based on the evidence, which is thoroughly detailed in parts III(A)(1–2) and III(B)(1–2), *supra,* reasonable jurors could have concluded that the conduct of the Mayor and the Chief of Police in administering the Everett Police Department showed a reckless or callous indifference to the rights of others.

Everett's final contention, that this type of harm was not a foreseeable consequence of either a custom of breaking down doors when arresting felons or a policy of inadequate training, etc., is unavailing. As discussed in parts III(A)(3) and III(B)(3), *supra,* an unbridled use of force was an almost certain consequence of a police department that acquiesced in unconstitutional arrest practices and had a policy which provided no training or guidelines on the modern standards governing arrest or the use of force, inadequate training of its command officers and supervision of its inferior officers, and little or no disciplining of police misconduct. Moreover, Lieutenant Stewart expressly told the Chief and the Mayor, prior to July 22–23, 1982, that something bad would happen unless the training and organization of the Everett police force were improved. We believe the evidence, as viewed in the plaintiffs' favor, supports the jury's imposition of punitive damages against the Mayor and the Chief.

## IV. THE JURY CHARGE

Everett contends that the trial judge's instructions were misleading and failed to accurately define the applicable legal standards to the jury. Specifically, it asserts that (1) his instruction as to gross negligence amounting to deliberate indifference was confusing and set too low a standard under which to assess § 1983 liability and (2) his instruction as to causation did not require that the jury find a direct causal connection between the municipal custom or policy and the harm suffered before imposing liability on the city. We reject each of these protests.

### A. *The "Gross Negligence Amounting to Deliberate Indifference" Instruction*

■ Everett stated at trial and now maintains that by instructing the jury on a theory of "gross negligence amounting to deliberate indifference," the trial judge "deprived the jury of a basic understanding of the deliberateness of municipal action required in order for there to be liability." Brief for Appellants at 26. Appellants urge that the trial court should have charged that for the city to be held liable, the municipal officials must have acted either intentionally or with reckless disregard for the consequences of their actions. The standard, however, is no longer open for argument. The Supreme Court has held that "deliberate indifference to

---

10. The Chief was found liable under both the unconstitutional custom theory and the inadequate training theory. The Mayor was deemed liable solely under the latter theory. The Mayor was assessed twenty thousand dollars in punitive damages; the Chief's punitive damages were assessed at thirty thousand dollars.

the rights of persons with whom the police come into contact" is the degree of fault necessary to hold a municipality liable under § 1983 for the inadequate training, etc., of its police force. *City of Canton v. Harris,* — U.S. at —, 109 S.Ct. at 1205; *see also Voutour,* 761 F.2d at 820 (adopting same standard in First Circuit). The trial judge's decision to use the deliberate indifference instruction rather than the intentional or reckless disregard instruction, therefore, was correct.

Everett next argues that even if gross negligence amounting to deliberate indifference is the proper standard, the judge's instructions describing that standard were wanting and likely confused the jury. We disagree. It is axiomatic that a party is entitled to a charge that adequately explains the law and does not mislead the jury. *See, e.g., Aubin v. Fudala,* 782 F.2d 280, 284 (1st Cir.1983). Each charge, however, must be judged in its entirety. *See Francis v. Franklin,* 471 U.S. 307, 315, 105 S.Ct. 1965, 1971, 85 L.Ed.2d 344 (1985); *Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 400–01, 38 L.Ed.2d 368 (1973); *Dyer v. Ponte,* 749 F.2d 84, 88 & n. 5 (1st Cir.1984); *Service Merchandise Co. v. Boyd Corp.,* 722 F.2d 945, 950 (1st Cir. 1983); 9 C. Wright & A. Miller, Federal Practice and Procedure § 2558 at 668 & n. 32.

In the case at bar, the judge described the standard of gross negligence amounting to deliberate indifference as follows:

> The fourth question has to do with the liability of the City of Everett with respect to recruitment, training, supervision, or disciplining of police officers amounting to deliberate indifference to the Civil Rights complainants, gross negligence. And the authorities in this Circuit say that if there is a causal connection, an affirmative link between failure in recruitment, training, and discipline and the conduct of the police, which is the result of gross negligence amounting to deliberate indifference, then the city may be liable. What is gross negligence amounting to deliberate indifference?

> The appellate courts generate these phrases in an attempt to guide us, and they have a rhetorical right to it. It sounds pretty fine. Gross negligence amounting to deliberate indifference. What does it mean? How do we flesh that rhetoric out to give it meaning in a particular case? I can help a little, I think, I hope, but basically you have to do that. I can't change that, I can't change the standards or alter them. You have to take what I have just said to you and make of it a rule to govern this case and these facts.

> I think, perhaps I suggest to you, and you can take this for what it's worth, that if we were to talk about gross indifference amounting to—excuse me, gross negligence amounting to deliberate indifference and we are to talk about it out of this context, out of the formal context of the courtroom, we might put it in terms of somebody just not giving a damn, somebody putting convenience, self-protection, even budgets ahead of the duty imposed to protect and preserve the citizens, the community, and I think I can also say that as a matter of law, the primary duty of the police departments and policemen is to protect and preserve life and property and the public peace. And if the City of Everett, through its supervising people, made a deliberate choice to follow a course of action or non-action which, in effect translates as "we don't give a damn," then liability would be imposed under this section.

> The official language, however, is gross negligence amounting to deliberate indifference, and you don't have to agree with me as to the vernacular translation of that, you can flesh that language out as you see fit.

Everett alleges that equating deliberate indifference with "not giving a damn" is error since it is confusing and fails to instruct that the municipal official involved must realize that his conduct is exposing the public to an unreasonable risk of forseeable harm. We find that the judge's charge, read as a whole, correctly defines the appropriate standard.

In addition to the portion of the charge already quoted, the judge instructed the jury:

> When we come to the supervising officers in the city, we have a different standard. The city and the supervising officers are liable only if there was a policy or practice, they deliberately chose a policy or practice which you find had a causal connection to the events which occurred on July 23rd.

He then twice read the Supreme Court's plurality holding in *Pembaur v. City of Cincinnati*, 475 U.S. at 483–84, 106 S.Ct. at 1299–1300.

> We hold that municipal liability under Section 1983 attaches where, only where a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.

In *City of Canton*, the Court reiterated its holding in *Pembaur* and explained that where "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, ... the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." —— U.S. at ——, 109 S.Ct. at 1205.

The district judge's explanation of deliberate indifference, read with the rest of his instructions, adequately states the correct legal standard as established by the Supreme Court for imposing municipal liability under § 1983.

■ Everett's final contention is that by allowing the jury to adopt its own definition of gross negligence amounting to deliberate indifference, the trial court invited the jury to find liability on a standard *lower than* gross negligence amounting to deliberate indifference. We cannot agree. First, the judge clearly instructed the jury that "negligence was not enough under 1983." Second, his overall charge, which specified both his definition of gross negligence amounting to deliberate indifference and the Supreme Court's holding in *Pembaur*, accurately describes the legal standard that the jury was to apply. Third, we do not believe that the judge invited the jury to come up with their own definition of the legal standard of gross negligence amounting to deliberate indifference. Rather, he stated: "The official language ... is gross negligence amounting to deliberate indifference, and you don't have to agree with me as to the vernacular translation of that, you can flesh that language out as you see fit." As we read the charge, he instructed the jury that it did not have to accept his vernacular example of "not giving a damn." We cannot say this constitutes reversible error.

## B. *The Causation Instruction*

■ Everett maintains that the judge's charge as to causation allowed the jury to impose liability based upon only a weak connection between the city's custom or policy and the plaintiffs' injuries. We hold that the trial judge's instructions regarding causation met the standards established by the Supreme Court. The Court requires that there be an "affirmative link" between the policy or custom alleged and the harm suffered, such that the policy or custom can be said to have been the "moving force" behind the constitutional violation. Here, in explaining the concept of causation the trial judge instructed:

> It is not enough to say, oh, that was bad police administration, that was sloppy, that was a violation of an ordinance or whatever. You have to show that there was a causal relationship, likely causal relationship; that is, the plaintiffs have to persuade you by a preponderance of the evidence that there was a causal relationship between whatever policies were adopted and the harm that the plaintiffs suffered.
>
> What is required under the Supreme Court's rulings in these matters is an affirmative link, an affirmative link between the conduct of the city and its supervisory officials and the harm that befell the plaintiffs.
>
> *       *       *       *       *       *
>
> When I say "caused" ... I'm talking about whether the policy or the acts com-

plained of were a moving force of the violation, whether there is an affirmative link between the conduct complained of and the harm suffered.

It is the rule of this circuit that a "defendant is not entitled to any specific words of instruction, but only to instructions that properly convey the applicable law of the case." *Kibbe,* 777 F.2d at 810 (collecting authorities). We believe that this instruction explained the applicable legal standards and adequately ensured that the jury not levy liability based upon only a remote causal link.

### V. THE ADMISSION OF POST–EVENT EVIDENCE

The defendants next contend that the trial judge committed reversible error by admitting certain evidence regarding events that transpired *after* the date of the beatings. The minimal probative value of these events, the defendants assert, is greatly outweighed by their unfair prejudicial effect, and, therefore, the evidence should have been excluded under Fed.R. Evid. 403.

■■■ The balancing done under Rule 403 between the probative value of a piece of evidence and its prejudicial effect is committed to the trial judge's discretion. *United States v. Mateos–Sanchez,* 864 F.2d 232, 235–36 (1st Cir.1988); *United States v. Simon,* 842 F.2d 552, 555 (1st Cir.1988); *Onujiogu v. United States,* 817 F.2d 3, 6 (1st Cir.1987) (collecting First Circuit cases). "Only rarely—and in extraordinarily compelling circumstances—will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect." *Freeman v. Package Machinery, Co.,* 865 F.2d 1331, 1335 (1st Cir.1988); *see United States v. Tierney,* 760 F.2d 382, 388 (1st Cir.), *cert. denied,* 474 U.S. 843, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985).

■■■ In the case at bar, the trial judge admitted post-event evidence of the lack of proper internal investigation of the attack and the failure take strong disciplinary action against the officers involved. The judge's rationale was that this evidence would tend to show what customs or policies were in effect in the City of Everett *before* the date of the attack. Such use of post-event evidence was expressly allowed by the Fifth Circuit in *Grandstaff v. City of Borger,* 767 F.2d 161 (5th Cir.1985), *cert. denied,* 480 U.S. 916, 107 S.Ct. 1369, 94 L.Ed.2d 686 (1986). *Grandstaff* involved the alleged improper use of deadly force by a group of police officers that resulted in the plaintiff's death. The court held:

> The policymaker's disposition, his policy on the use of deadly force, after August 11 [the date of the incident] was evidence of his disposition prior to August 11. See 2 Wigmore, Evidence §§ 382, 437 (Chadbourn rev. 1979). As subsequent conduct may prove discriminatory motive in a prior employment decision, *see McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), and subsequent acts may tend to prove the nature of a prior conspiracy, *see Anderson v. United States,* 417 U.S. 211, 219, 94 S.Ct. 2253, 2260, 41 L.Ed.2d 20 (1974), so the subsequent acceptance of dangerous recklessness by the policymaker tends to prove his preexisting disposition and policy.

767 F.2d at 171.

The *Grandstaff* "court emphasized that the police chief's failure to make changes in practice in the aftermath of this incident allowed an inference that the officers' actions were 'the way things are done and have been done in the City of Borger', and thus reflected city policy." *Kibbe,* 777 F.2d at 806 (quoting *Grandstaff,* 767 F.2d at 171) (citation omitted). Contrary to the defendant's contention, the Supreme Court's recent opinion in *City of St. Louis v. Praprotnik,* 108 S.Ct. 915, does not foreclose such use of post-event evidence. In *Praprotnik,* a plurality of the Justices determined that to be actionable under § 1983, a municipal policy or custom must have been adopted or acquiesced in by an actor with " 'final policymaking authority.' " *Id.* at 924. The Court has never held that inferences about what customs or

policies existed in a city before an event could not be drawn from subsequent actions. Post-event evidence can shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right. We thus affirm the lower court's decision that any possible unfair prejudice resulting to the defendant from the introduction of this evidence is outweighed by the probative value it possesses.[11]

## VI. ATTORNEYS' FEES

Defendants allege that the district court made two errors in calculating its award of attorneys' fees under 42 U.S.C. § 1988.[12] First, the court compensated the plaintiffs for time spent examining and researching theories that ultimately proved to be irrelevant to the case. The inclusion of these misspent hours in the fee calculation, the defendants assert, resulted in an overestimation of the reasonable number of hours expended on the case. Second, plaintiffs did not provide evidence of, nor did the district court make a ruling as to the reasonable hourly rate prevailing in the community for similar legal services. Instead, defendants maintain, the court based its hourly rate calculation solely on the affidavits of the plaintiffs' attorneys. Since the Supreme Court has declared that the plaintiff bears the burden of establishing what the prevailing market rate is for comparable legal services, *Blum v. Stenson*, 465 U.S. 886, 895 n. 11, 104 S.Ct. 1541, 1547 n. 11, 79 L.Ed.2d 891 (1984), the defendants argue that the case must be remanded to determine the reasonable hourly rates for the services rendered by plaintiffs' attorneys.

We note initially the great discretion that is to be afforded a district court's determination of attorneys' fees under 42 U.S.C. § 1988. *See Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983); *Lund v. Affleck*, 587 F.2d 75, 77–78 (1st Cir.1987); *King v. Greenblatt*, 560 F.2d 1024, 1026 (1st Cir. 1977), *cert. denied*, 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978). We may reverse the award granted by the district court only if we find that there has been an abuse of that discretion. *See Wojtkowski v. Cade*, 725 F.2d 127, 130–31 (1st Cir. 1984); *Grendel's Den, Inc. v. Larkin*, 749 F.2d 945, 950–51 (1st Cir.1984). Thus, while "appellate courts have a duty to review carefully the basis for the award and to ensure that the amount is reasonable," *Grendel's Den, Inc.*, 749 F.2d at 950, the lion's share of the responsibility for setting attorneys' fees is vested in the district court judge.

We deal first with the lower court's calculation as to the number of hours reasonably expended on this case and affirm its determination. The attorneys for the plaintiffs supplied the court with contemporaneous time records that set forth the number of hours they had spent working on this litigation. *See Grendel's Den, Inc.*, 749 F.2d at 952 (requiring those requesting attorneys' fees under 42 U.S.C. § 1988 to submit time sheets documenting the hours that they had spent on

---

11. The trial judge admitted this evidence solely as to the 42 U.S.C. § 1983 cause of action. He expressly foreclosed the jury from using it to find municipal liability under the Massachusetts Torts Claims Act. The trial court instructed the jury as follows:

They [the post-event incidents] are not admissible as relating to or not independently admissible as relating to the cause of that turmoil at that time, but they are admissible only insofar as they may illuminate for you the policies and attitudes of the administration of the City of Everett as it existed prior to July 22 and July 23, the theory being that there may be a continuity in municipal policy so that what happens after the event may cast some light on what the policy was prior to the

event. Now that's the only purpose for which I am admitting this post July '82 evidence.

12. While there may be other factors that affect the final calculation of attorneys' fees, *see* Annotation, *Construction and Application of Civil Rights Attorney's Fees Award Act of 1976*, 43 A.L.R.Fed. 243, 298–303 (1979), the basic procedure is to multiply the number of hours reasonably spent preparing the case by the prevailing hourly rate in the community for comparable legal services. *See Blum v. Stenson*, 465 U.S. 886, 892–95 & nn. 5–11, 104 S.Ct. 1541, 1545–47 & nn. 5–11, 79 L.Ed.2d 891 (1984); *Hensley v. Eckerhart*, 461 U.S. 424, 433–34, 103 S.Ct. 1933, 1939–40, 76 L.Ed.2d 40 (1983).

the case); *Wojtkowski,* 725 F.2d at 130 (same). Contrary to the defendants' contentions that the court blindly accepted the plaintiffs' proffered number of hours, the district judge painstakingly reviewed the detailed time records submitted by the plaintiffs' counsel. He then excluded a number of hours finding them to be unreasonable. As to the time spent researching inapplicable theories, the judge dealt with this by denying plaintiffs' request for an enhancement of the fee. He stated that:

> Plaintiffs took a number of wrong turns in the early years of this litigation. Indeed, at one point plaintiffs had to file amended complaints because their complaint against the cities and the supervisory personnel had been dismissed.... In light of the compensation plaintiffs' counsel are receiving for these hours, an additional contingency risk multiplier is not appropriate.

Based on this reasoning and our own review of the time records, we find no abuse of discretion in the lower court's careful calculation of the number of compensable hours. *See Hensley,* 461 U.S. at 433–34, 103 S.Ct. at 1939–40; *Fidelity Guarantee Mortgage Corp. v. Reben,* 809 F.2d 931, 936 (1st Cir.1987); *Wildman v. Lerner Stores Corp.,* 771 F.2d 605, 610 (1st Cir. 1985).

■ The defendants' request for a remand because the district court failed to make a finding as to the "prevailing market rate" has significantly more merit. We believe that *Blum v. Stenson* places a burden on a party requesting attorneys' fees to establish—by evidence other than his own attorneys' affidavits—the prevailing hourly rate in the community for comparable legal services. The *Blum* Court stated:

> In seeking some basis for a standard, courts properly have required prevailing attorneys to justify the reasonableness of the requested rate or rates. To inform and assist the court in the exercise of its discretion, *the burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community* for similar services

by lawyers of reasonably comparable skill, experience, and reputation. A rate determined in this way is normally deemed to be reasonable, and is referred to—for convenience—as the prevailing market rate.

465 U.S. at 895 n. 11, 104 S.Ct. at 1547 n. 11 (emphasis added). This circuit has consistently followed that teaching. *See Hall v. Ochs,* 817 F.2d 920, 928–29 (1st Cir.1987); *Reben,* 809 F.2d at 936; *Wildman,* 771 F.2d at 610; *Grendel's Den, Inc.,* 749 F.2d at 955–56; *see also Segal v. Gilbert Color Systems, Inc.,* 746 F.2d 78, 85–87 (1st Cir. 1984) (applying *Blum* rationale to the determination of attorneys' fees under 28 U.S.C. § 1875). While some courts have indicated that a district court may rely on its own knowledge of attorneys' rates in the area, *see Wojtkowski,* 725 F.2d at 130–31, "something more than a bald, unsupported amount is necessary." *Chalmers v. City of Los Angeles,* 796 F.2d 1205, 1211 n. 3 (9th Cir.1986).

■ In the case at bar, plaintiffs have failed to carry their burden of proving the prevailing market rate. They have produced no evidence that would establish the prevailing rate for comparable legal services other than their own attorneys' affidavits. Moreover, due to this lack of evidence, the district court failed to make a determination as to the prevailing market rate. Even though the defendants have not shown that the rates utilized by the lower court were, in fact, improper, we believe that the failure of the district court to determine the prevailing rate constitutes an abuse of discretion and requires a remand. *See Ramos Colon v. Secretary of Health and Human Services,* 850 F.2d 24, 27 (1st Cir.1988) (per curiam) (noting failure of party to establish prevailing rate required remand to reassess attorneys' fees in a Social Security Act case). On remand, the "district court must provide a 'clear explanation of its reasons for the fee award.'" *Grendel's Den, Inc.,* 749 F.2d at 950 (quoting *Hensley,* 461 U.S. at 437, 103 S.Ct. at 1941).

Since a remand is necessary to reassess the attorneys' fee award, the plaintiffs

have asked that the district court also be allowed to reconsider its denial of their request for an enhancement of the attorneys' fees award based on the complexity and the high risk of failure associated with bringing this case. We reject this request; the remand is to consider only the narrow issue of determining the prevailing rate in the community for comparable legal services. Once that rate has been found and is then multiplied against the already established number of hours expended by the plaintiffs' attorneys, the district court's job will be over.

## VII. CONCLUSION

Police officers must comport themselves in accordance with the laws that they are sworn to enforce *and* behave in a manner that brings honor and respect for rather than public distrust of law enforcement personnel. They are required to do more than refrain from indictable conduct. Police officers are not drafted into public service; rather, they compete for their positions. In accepting employment by the public, they implicitly agree that they will not engage in conduct which calls into question their ability and fitness to perform their official responsibilities.

*Police Comm'r of Boston v. Civil Serv. Comm'n,* 22 Mass.App.Ct. 364, 494 N.E.2d 27, 32, *review denied,* 398 Mass. 1103, 497 N.E.2d 1096 (1986).

We affirm the judgment below holding the City of Everett liable under § 1983. We do not reach the state-law questions.

Remanded for a redetermination of attorneys' fees.

So ordered.

Costs to appellees.