Makris v. Salem, NH                    CV-97-330-SD   10/29/98
                    UNITED STATES DISTRICT COURT FOR THE

                         DISTRICT OF NEW HAMPSHIRE


Spiros Makris, individually
 and as Administrator of the
 Estate of Dimitrios "James
 Makris; and
Sofia Beredimas Makris

_____v.                               Civil No. 97-330-SD

Town of Salem, New Hampshire;
Steven MacKinnon, individually
 and as Chief of Police of the
 Town of Salem, New Hampshire; and
Stephen Daly; Charles Moore;
William Teuber; Fred Rheault;
John Doe; Peter Delorey,
 individually and as Police
 Officers for the Town of Salem


                            O R D E R


     The plaintiffs,[1] parents of an individual who died in a

motorcycle accident while being pursued by police, as

representatives of their son's estate, claim that the defendants,

Town of Salem, New Hampshire, and Salem police officers

associated with the chase, deprived their son of his

constitutional rights in violation of 42 U.S.C. §§ 1983 and 1985.

_____

     [1]Plaintiffs have requested oral argument on their motion.
The court does not believe that oral argument would be helpful
and therefore denies this request.

In addition, plaintiffs allege state-law claims of wrongful death, intentional infliction of emotional distress, and negligence. Currently before the court is defendants' motion for summary judgment as to all federal claims, to which plaintiffs, Spiros and Sofia Makris, object. For the reasons that follow, this court grants the defendants' motion in its entirety.

BACKGROUND

This case arises from a police surveillance and chase of plaintiffs' son, James Makris (Makris), that began because the police believed that Makris had possession of a stolen, loaded weapon. On the afternoon of July 12, 1995, the Atkinson, New Hampshire, police department informed the Salem police department that a loaded Smith & Wesson .45 caliber semiautomatic handgun had been stolen from a construction site and that three male suspects were headed toward Salem in a red Camaro. Shortly after receiving this information, Officer Steven Malisos of the Salem police department stopped a red Camaro with two male occupants at the Rockingham Mall in Salem, New Hampshire. Detective Fred Rheault, Sergeant Peter Delorey, and Officer William Teuber, all from the Salem police department, arrived soon after to assist Malisos. Incident to the arrest of the Camaro's two occupants, Frank Bemis and Dana Fritsch, the police found a black pellet gun

2

in the car, but did not find the stolen handgun. In questioning Bemis and Fritsch, Malisos and Rheault discovered that immediately prior to coming to the mall, Bemis and Fritsch had given a third person, James Makris, a ride to his parents' home on Cortland Drive in Salem. In addition, both Bemis and Fritsch knew that their boss kept a handgun in his truck at a construction site and informed the police that Makris also was aware of this information. They said they did not know whether Makris had the gun. Based upon this investigation, Delorey suspected that Makris had possession of the stolen, loaded weapon, so Delorey instructed Teuber to survey (discreetly) the Makris home and to make sure Makris did not leave the area while a search warrant was being obtained for the gun.

The Makris home is located at the end of Cortland Drive, a dead-end street. The only exit from the Makris home by vehicle is through the intersection of Cortland Drive and Brady Avenue. Because Teuber did not have an unmarked cruiser when he went to survey the Makris home, he parked his car near the end of Cortland Drive where it intersected with Brady Avenue. From this position Teuber could not see the Makris home, nor could the occupants of the Makris house see his car, but Teuber could see

3

vehicles as they drove down Cortland Drive toward Brady Avenue.[2]

After Teuber had been parked on Cortland Drive for at least twenty minutes, Officer Charles Moore pulled up along the driver's side of Teuber's car so that Moore's cruiser faced Brady Avenue. Teuber informed Moore that Makris was suspected of being in possession of a stolen, loaded handgun, that Makris had been last seen at his parents' address on Cortland Drive, and that Teuber was instructed to make sure Makris did not leave the area until the police obtained a search warrant for the gun.

Soon after this conversation, Teuber thought he saw Makris slowly traveling down Cortland Drive toward him on a motorcycle. Although Makris wore a full face helmet, Teuber alleges he was able to identify Makris from his physique.[3] Teuber communicated to Moore that the operator of the motorcycle was Makris and pulled out after Makris. Moore followed Teuber in pursuit of Makris. Both officers followed Makris onto Brady Avenue and engaged their emergency lights and sirens to pull Makris over. Soon after, Makris pulled over to the side of the road on Brady

---

[2]Teuber's car was positioned on the grass perpendicular to Cortland Drive, allowing him to pull out onto Cortland Drive without difficulty.

[3]Teuber had encountered Makris weightlifting at his gym for over a year and knew that Makris had an unnaturally bulky physique (which Teuber suspected was due to steroid abuse).

4

Avenue.  Teuber parked directly behind Makris.  Moore parked next to Makris at an angle partially boxing in Makris's motorcycle. At this time Teuber reported license plate information from Makris's motorcycle to the Salem police department.  The motorcycle had been stopped for approximately fifteen to thirty seconds, but before either officer could approach Makris, he took off on his motorcycle at a high rate of speed down Brady Avenue toward Cross Street.

After Makris took off, both officers followed Makris with their blue lights and sirens engaged.  At this time Moore was behind Makris, and Teuber followed Moore.  Both officers traveled approximately a quarter mile down Brady Avenue before turning onto Cross Street after Makris.  After turning onto Cross Street, Teuber could not see Makris, but Moore could.  At about this time the police officers learned from headquarters that the motorcycle Makris was operating had been stolen within the last month.  As Makris sped[4] down Cross Street toward New Hampshire Road, Moore began to lose sight of him until he could only see Makris's motorcycle intermittently in the distance ahead of him.[5]  When

_____

[4]The officers estimate that Makris was traveling at approximately a hundred miles per hour.

[5]Brady Avenue and New Hampshire Road are mostly rural roads without sidewalks.  Cross Street is more built up, with residences which are closer together, but this road also does not have sidewalks.

Moore and Teuber reached the intersection of Cross Street and New Hampshire Road, they did not know which way Makris had gone. Moore took a right onto New Hampshire Road and Teuber took a left onto New Hampshire Road.

Shortly after Teuber turned left onto New Hampshire Road, he saw Officer Rheault traveling toward him in the opposite direction on that street. Rheault, who knew of the chase via the police radio and had been looking for Makris in this area, informed Teuber that Makris had not gone in the direction in which Teuber was proceeding.

As Moore traveled down New Hampshire Road (in the opposite direction of Teuber), he saw a flash in the distance ahead of him that he thought might be the motorcycle and transmitted this information to the police department. Within a half mile after seeing this flash, Moore came upon Makris, who was lying in the middle of New Hampshire Road.

Makris's motorcycle had crashed into a fire hydrant, and the impact threw Makris onto the street. Moore radioed for an ambulance and approached Makris. Makris was conscious and still wore his helmet. When Moore tried to question Makris about the location of the stolen gun, he could not understand anything Makris said and could tell that Makris was physically injured and in pain. Makris attempted to get up and to remove his helmet.

6

Moore instructed Makris to stay where he was until the ambulance arrived and helped Makris take off his helmet. Soon after, Officer Rheault arrived at the scene and also questioned Makris about the gun without any success.[6] The total distance traveled from Cortland Drive to the scene of the crash was between 1.5 and 2.0 miles. As a result of injuries from the motorcycle crash, Makris died a few days later.

DISCUSSION

## 1. Standard of Review

The court may only grant a motion for summary judgment where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Accordingly, at this stage of the proceeding, the court does not weigh the evidence and determine the truth of the matter, but instead determines whether there is a genuine issue of fact for trial. See Stone & Michaud Ins. Bank Five for Savings, 785 F. Supp. 1065, 1068 (D.N.H. 1992) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)). The

---

[6]The stolen gun was not found at the scene of the accident but was found by police at the Makris's house later in the day.

substantive law identifies which facts are material so that "'[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted.'"  Caputo v. Boston Edison Co., 924 F.2d 11, 12-13 (1st Cir. 1991) (quoting Anderson, supra, 477 U.S. at 248).

The party seeking summary judgment bears the initial burden of establishing the lack of genuine issues of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Quintero de Quintero v. Aponte-Roque, 974 F.2d 226, 227-28 (1st Cir. 1992). As a result, the court must view the entire record in the light most favorable to the nonmoving party, "'indulging all reasonable inferences in that party's favor.'"  Mesnick v. General Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (quoting Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990)).  However, once a defendant has submitted a properly supported motion for summary judgment, the plaintiff "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."  Anderson, supra, 477 U.S. at 256.

## 2.  42 U.S.C. § 1983

Pursuant to 42 U.S.C. § 1983, litigants can bring civil actions against government officials who "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . ., subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . ." 42 U.S.C. § 1983 (1994).  As the basis for their section 1983 action, plaintiffs claim that the police officers violated Makris's Fourth and Fourteenth Amendment rights by pursuing and stopping him as they did.

Defendants assert three defenses against this section 1983 claim: (1) plaintiffs fail to establish a Fourth Amendment due process violation because Makris was not seized as the term applies to the Fourth Amendment; (2) plaintiffs fail to establish a substantive due process violation under the Fourteenth Amendment because Salem Police had a legitimate police purpose in pursuing Makris; and (3) even if a constitutional violation is established under the Fourth or Fourteenth Amendments, the police officers are entitled to qualified immunity.  See Defendants' Motion For Summary Judgment.

To determine whether the police officers should be afforded the protection of qualified immunity, the court first must

9

evaluate the merits of this case.  <u>See</u> <u>Siegert v. Gilley</u>, 500 U.S. 226, 232 (1991) ("A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all."), <u>reh'g denied</u>, 501 U.S. 65 (1991).  According to the First Circuit, "[a] court may . . . bypass the qualified immunity analysis if it would be futile because current law forecloses the claim on the merits." <u>Aversa v. United States</u>, 99 F.3d 1200, 1215 (1st Cir. 1996) (bypassing qualified immunity analysis, court found no viable constitutional claim where plaintiff was discharged by a third party as a result of defendant's defamatory statements).  Like the <u>Aversa</u> court, this court will bypass the issue of qualified immunity because current law forecloses the claim on the merits, making it unnecessary to engage in qualified immunity analysis.

### 3.  Fourth Amendment

Plaintiffs claim that Makris's temporary stop and the following pursuit were an unreasonable seizure by the police in violation of the Fourth Amendment, which states, in part, that people have the right "to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures."

10

U.S. CONST. amend. IV. Before the court can reach the question of reasonableness of the police action involved, the court must first determine if the police actually seized Makris, as plaintiffs allege.

According to Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968), "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." Thus, for a seizure to occur, there must be some physical force or show of authority by the police. It is obvious in this case that the police, in their marked cars with lights and sirens engaged at the time they pulled Makris over and during their pursuit of Makris, displayed their authority to Makris.

Even if there is some show of authority by police, such as when the police flash their lights or run after a person, there is no seizure unless the individual submits to the show of authority. See California v. Hodari D., 499 U.S. 621, 628-29 (1991) (Court found no seizure during pursuit of individual because individual did not comply with police order to stop). Before the court will find a seizure under the Fourth Amendment, there must be a restraint of an individual's movement by authorities in one of two ways: *either* through submission by the individual to authorities *or* through government action,

intentionally applied, that is successful in terminating an individual's movement. This physical control of an individual by authorities is necessary because a seizure occurs when possession of an item is taken which brings the item under the physical control of another. See id. at 624. Furthermore, contrary to plaintiffs' suggestion, a seizure is not continuous, but rather is a single event. See id. at 625. Thus, even if an official physically restrains a person in some way, either through the individual's submission or through physical force which is intentionally applied, if that person escapes the official's physical control, the seizure ends. An individual who flees from government officials certainly has not submitted to these officials in any way that would result in a Fourth Amendment seizure. See id. at 624. Consistent with the Court's view on submission and individuals in flight, the District of Columbia Circuit has ruled that the operator of a vehicle who initially stopped when police pulled him over was not "seized" within the meaning of the Fourth Amendment because he did not actually submit to police authority when he drove away before officers could reach his vehicle. United States v. Washington, 12 F.3d 1128, 1132 (D.C. Cir. 1994), cert. denied, 513 U.S. 828 (1994). Thus, according to current law, if a person has not submitted to the authorities in some way, absent some intentional exertion of

12

physical force over a person by authorities, there cannot be a seizure. See United States v. Young, 105 F.3d 1, 6 (1st Cir. 1997) (court found no seizure where police officers pulled their car next to the operator of a vehicle and asked if they could question him briefly) (citing United States v. Sealy, 30 F.3d 7, 9-10 (1st Cir. 1994) (court found no seizure where police officers briefly questioned from their cruiser an individual on the street, and he fled)).

Contrary to plaintiffs' assertions, an individual, prior to his or her capture, will not be considered to be seized while fleeing from officials because this individual has not submitted to authorities in any way. Even though Makris initially stopped for the police, this stop can hardly be considered a submission to police authority when he sped away before the officers could approach him. Thus the court cannot find a Fourth Amendment seizure based upon submission to authority where Makris showed no signs of submission.

Without submission, an individual in flight, as was Makris, could still be seized under the Fourth Amendment if government officials actually stop him or her by an intentional act. See Brower v. County of Inyo, 489 U.S. 593, 596-98 (1989). The court has specifically addressed this issue in several cases involving police chases. In Brower, the court found that the police seized

13

an individual when he crashed into a roadblock which police had purposefully positioned in such a way that he would crash into it. See id. at 598. Despite this ruling, the Court has noted specifically that, even though a chase by police communicates to an individual that they want the individual to stop, this does not necessarily implicate Fourth Amendment protections. See Michigan v. Chesternut, 486 U.S. 567, 574-75 (1988) (Court found no Fourth Amendment seizure where police drove alongside an individual who was running away from them). Accordingly, when a police chase is terminated because the suspect crashes, there is no seizure unless law officials purposely caused the crash in some way. See County of Sacramento v. Lewis, ___ U.S. ___, ___, 118 S. Ct. 1708, 1715 (1998) ("no Fourth Amendment seizure would take place where a 'pursuing police car sought to stop the suspect only by the show of authority represented by flashing lights and continuing pursuit,' but accidentally stopped the suspect by crashing into him"); Horta v. Sullivan, 4 F.3d 2, 9-10 (1st Cir. 1993) (court found no seizure by a pursuing officer who chased a motorcyclist for over three miles at speeds as high as 75-80 miles per hour, even though motorcyclist lost control of his motorcycle and crashed into another officer's vehicle).

According to these standards set by the Court, even though Makris temporarily pulled over, no physical force was

intentionally applied by the police toward Makris that would suggest they had seized him. This is not a case like <u>Terry</u>, where a seizure occurred because an officer physically touched a suspect. <u>See</u> <u>Terry</u>, <u>supra</u>, 392 U.S. at 17-19. Instead, the officers in this case could not get physically close to Makris during his temporary stop. Because Makris fled before police approached him, the court cannot find that the police took physical "possession" of Makris during his temporary stop in any way that would result in a seizure.

Additionally, even though Makris's movement was terminated when he lost control of his motorcycle and crashed into a fire hydrant, in no way can this termination of Makris be considered a seizure by police. Only if the police had intentionally caused Makris to stop in some way, such as placing a roadblock in a manner that would cause him to crash, could the court find that these police officers seized Makris when he lost control of his motorcycle. Because the court finds no evidence of a seizure in this case, the Fourth Amendment claim against the defendants must fail.

## 4. Fourteenth Amendment

If a constitutional claim alleging abusive conduct by government officials is covered by a specific constitutional

15

provision, like the Fourth Amendment, the claim must be analyzed under the standard appropriate to that provision. See Lewis, supra, ___ U.S. at ___, 118 S. Ct. at 1715. On the other hand, if no specific constitutional provision applies regarding allegations of physical abuse caused by government officials, as in the present case, the court may analyze the claim according to the substantive due process standards of the Fourteenth Amendment. See id. Accordingly, despite the failure of plaintiffs' Fourth Amendment claim, there is still a possibility that defendants could be liable under section 1983 based on the Fourteenth Amendment.

Plaintiffs urge the court to apply a deliberate indifference standard when determining if defendants violated Makris's substantive due process rights under the Fourteenth Amendment. Alternatively, plaintiffs allege that even if the court applies a shock-the-conscience standard rather than a deliberate indifference standard to defendants' conduct, they can still prove violations of Makris's Fourteenth Amendment rights because the actions by defendants were so egregious. Contrary to these assertions, the court is not convinced that plaintiffs have presented evidence to prove that the actions of the police officers rise to the level of "conscience shocking" as required by the Fourteenth Amendment standard.

16

The Fourteenth Amendment provides in part that no state shall "deprive any person of life, liberty or property, without due process of the law." U.S. CONST. amend. XIV, § 1. This provision protects individuals against deliberate action by government officials intended "'to deprive a person of life, liberty, or property.'" See Lewis, supra, ___ U.S. at ___, 118 S. Ct. at 1718 (quoting Daniels v. Williams, 474 U.S. 327, 332 (1986)). Again, the court considers the totality of the circumstances to determine whether there has been a Fourteenth Amendment violation by such officials. See, e.g., Evan v. Avery, 100 F.3d 1033, 1038 (1st Cir. 1996), cert. denied, 117 S. Ct. 1693 (1997).

The Court has emphasized that not all government action which causes harm to an individual is actionable under the Constitution. See Lewis, supra, ___ U.S. at ___, 118 S. Ct. at 1717-18. In high-speed police pursuits in particular, the First Circuit has ruled that only those actions by government officials that "shock the conscience" will be violations of due process under the Fourteenth Amendment. See Evans, supra, 100 F.3d at 1038. In Evans, the police pursued a suspect in a densely populated residential area where traffic was heavy and pedestrians were prevalent. Even though the pursuit resulted in the death of a ten-year-old pedestrian, the court, considering

17

the totality of the circumstances, ruled that because the actions by the police did not amount to anything more than ordinary negligence, and did not shock the conscience, there could be no Fourteenth Amendment violation. See id. at 1038. Since Evans, the Supreme Court, specifically rejecting the "deliberate indifference" standard proposed by plaintiff here, adopted this shock-the-conscience standard for all actions involving Fourteenth Amendment violations by law enforcement officials during high-speed police chases. See Lewis, supra, ___ U.S. at ___, 118 S. Ct. at 1717. In establishing this higher standard to apply to situations where the police have to make split-second decisions, the Court explained that the Constitution focuses on the major concerns between "'the governors and the governed, but it does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society.'" Id. at 1718 (quoting Daniels, supra, 474 U.S. at 332). Accordingly, this court will apply a shock-the-conscience standard to defendants' actions to determine whether these government officials violated Makris's substantive due process rights under the Fourteenth Amendment.

Actions of government officials that can be deemed to be so arbitrary and so egregious that they shock the conscience occur in situations where government officials intend "to injure

18

[an individual] in some way unjustifiable by any government interest." See Lewis, supra, ___ U.S. at ___, 118 S. Ct. at 1718. For instance, in circumstances where a police officer is engaged in a high-speed automobile chase aimed at apprehending a suspected offender, a due process violation under the Fourteenth Amendment will only be found if the purpose of the police chase was to cause harm to the individual, unrelated to any legitimate police objective. See id. at 1720. This result may seem harsh, but as Justice Kennedy points out in his concurrence in Lewis, "[t]here is a real danger in announcing a rule, or suggesting a principle, that . . . suspects may ignore a lawful command [by police] to stop and then sue for damages sustained in an ensuing chase," as this could cause suspects to flee more often. Id. at 1722 (Kennedy, J., concurring).

Accordingly, in the instant case, for a violation of the Fourteenth Amendment, there must be evidence that the police officers had an intent to harm the decedent that was not justified by any legitimate police purpose. Based on the standards discussed above, there is no evidence in this case that the police officers engaged in activity that deprived Makris of his Fourteenth Amendment rights. The officers attempted to pull Makris over only because they thought he was the person driving the motorcycle and they suspected he was in possession of a

19

stolen, loaded weapon.  Furthermore, after Makris fled and engaged the officers in pursuit, the officers then knew that Makris had failed to stop for them, that he was operating a stolen vehicle, and that he was driving greatly in excess of the posted speed limit.  It is clear that these officers had a legitimate police purpose in pursuing Makris.  To the contrary, there is no evidence that the officers' intent was to harm Makris.  Like the officers in Lewis, Teuber and Moore were faced with lawless behavior for which they were not to blame; these officers only acted upon their duties to enforce the law, not to harm or kill Makris.  See id. at 1721.  Consequently, the totality of the circumstances in this case does not suggest that the officers' behavior was conscience shocking, and therefore there can be no Fourteenth Amendment claim against the defendants.

Because the court has determined that the defendants' actions did not involve either Fourth or Fourteenth Amendment violations, as alleged by the plaintiffs, the section 1983 claim against the police officers must fail.

5.  42 U.S.C. § 1985

Plaintiffs allege that the police officers, as individual defendants, conspired against Makris in violation of 42 U.S.C.

20

§ 1985.  Federal law protects individuals against two or more people who conspire "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws" by allowing individuals to recover for injuries caused by these conspirators in a civil action.  42 U.S.C. § 1985(3)(1994).  Unlike section 1983 actions, defendants in section 1985 actions are not required to be acting "under color of state law;" therefore, private as well as public officials may be named as defendants. See <u>Griffin v. Breckenridge</u>, 403 U.S. 88, 96-97 (1971) (Court ruled that according to 42 U.S.C. § 1985 private conspirators who committed a racially motivated assault while on a public highway could be sued by injured plaintiffs).

Without distinguishing between private or public defendants, the <u>Griffin</u> Court also ruled that to bring a conspiracy claim under 42 U.S.C. §1985(3), plaintiffs must show that the conspiracy was motivated by "'some racial, or perhaps otherwise class-based, invidiously discriminatory animus.'" <u>Aulson v. Blanchard</u>, 83 F.3d 1, 3 (1st Cir. 1996) (because town selectman could not show he belonged to cognizable class, his conspiracy claim under 42 U.S.C. § 1985(3) failed) (quoting <u>Griffin</u>, <u>supra</u>, 403 U.S. at 102).  The First Circuit and several other circuits

have interpreted the <u>Griffin</u> Court's analysis regarding section 1985(3) conspiracies to mean that there is "no principled basis for distinguishing between public and private conspiracies." <u>Aulson</u>, <u>supra</u>, 83 F.2d 4. Thus all plaintiffs who bring civil actions under this statute "must allege facts showing that (1) the defendants conspired against them because of their membership in a class, and (2) the criteria defining the class are invidious." <u>Id.</u>

Plaintiffs in this case have not alleged that defendants' actions were motivated by any class bias. "'Judges are not expected to be mindreaders. . . . [A] litigant has an obligation "to spell out its arguments squarely and distinctly . . . ."'" <u>Willhauck v. Halpin</u>, 953 F.2d 689, 700 (1st Cir. 1991) (quoting <u>United States v. Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990) (other citations omitted)). Accordingly, where the plaintiffs have not alleged that Makris belonged to any cognizable class against which the defendants were invidiously conspiring, the court will not analyze this issue further.

## 6. Town and Supervisory Liability

Plaintiffs allege that the Town of Salem failed to train its employees adequately in the areas of surveillance and high-speed police chases and that this failure resulted in the violation of

22

Makris's constitutional rights. According to <u>Monell v. New York City Dep't of Social Services</u>, 436 U.S. 658, 694-95 (1978), a municipality will only be held liable under section 1983 if: (1) municipal employees have deprived individuals of their constitutional rights and (2) it is the execution of the government's policy that is ultimately responsible for the deprivation of rights. <u>See also</u> <u>Bordanaro v. McLeod</u>, 871 F.2d 1151, 1154-55 (1st Cir. 1989).

This court has emphasized that even though a person may be harmed in some way through his or her interaction with municipal employees, if that person has suffered no constitutional injuries by these employees, then the municipality itself cannot be liable under section 1983. <u>See</u> <u>Evans</u>, <u>supra</u>, 100 F.3d at 1039; <u>Hayden v. Grayson</u>, 134 F.3d 449 (1st Cir. 1998) (where plaintiffs could not prove equal protection violation against police chief, town could not be found liable for its police policies). Accordingly, because all of plaintiffs' federal claims against the pursuing officers fail, there remains no federal basis for imposing liability against the Town of Salem, the police department, or the police officers' supervisors.

## 7. State Claims

Because this court has eliminated the federal claims, the court declines to hear this case based upon state-law claims alone. See 28 U.S.C. §1367(c) (1998) (authorizing district court to decline jurisdiction after it "has dismissed all claims over which it has original jurisdiction"); Camelio v. American Federation, 137 F.3d 666, 672 (1st Cir. 1998) ("balance of competing factors ordinarily will weigh strongly in favor of declining jurisdiction over state law claims where the foundational federal claims have been dismissed at an early stage in the litigation").

Plaintiffs have asked this court to remand the instant case to state court. "Remand" is impossible, however, because plaintiffs, by choice, initiated this case in federal court, not state court. See 28 U.S.C. § 1447(c) (1998) (case removed from state court to federal court "shall be remanded" back to state court if at any time before final judgment the district court lacks subject matter jurisdiction (emphasis added)). If plaintiffs wish to have their state claims adjudicated in state court, then they will have to file those claims with that court.

## Conclusion

For the abovementioned reasons, defendants' motion for summary judgment (document 8) is granted as to Counts I-IV.  The remaining state claims in Counts V-VIII are dismissed without prejudice.  The clerk of court shall enter judgment accordingly.

SO ORDERED.

_____
Shane Devine, Senior Judge
United States District Court

October 29, 1998

cc:  Peter G. Callaghan, Esq.
     Mitchell J. Wallman, Esq.
     James B. Krasnoo, Esq.
     Donald E. Gardner, Esq.

25