**Randy BRITTON and Carolyn Britton, Plaintiffs,**

v.

**Patrick MALONEY, et al., Defendants.**

**Civ.A. No. 93–11430–NG.**

United States District Court, D. Massachusetts.

Sept. 10, 1995.

Randy Britton, Lexington, MA, pro se.

Carolyn P. Britton, Lexington, MA, pro se.

Mary Jo Harris, Assistant Corporation Counsel, City of Boston Law Department, Boston, MA, for Defendants.

### MEMORANDUM AND DECISION

GERTNER, District Judge.

## I. INTRODUCTION

Plaintiffs, acting *pro se*, sue certain named and unnamed Boston police officers, the former Boston Police Commissioner, Francis M. Roache ("Roache" or "Commissioner Roache"), in his individual and official capacities, the former Mayor of Boston, Raymond Flynn ("Flynn" or "Mayor Flynn"), in his individual and official capacities, as well as the City of Boston proper. They allege that a gun belonging to one of them, Randy Britton ("Britton"), which was properly registered, was unlawfully seized by Boston police officers, and that to cover up their misconduct, the police fabricated felony charges against Britton. They contend that this misconduct violated Britton's constitutional rights to be free from unreasonable searches and seizures and to due process of law; and since Britton is an African–American male, that the police officers' actions constituted an unlawful conspiracy to interfere with his civil rights within the meaning of 42 U.S.C.

§ 1985, an unlawful failure to protect his civil rights within the meaning of 42 U.S.C. § 1986, and a violation of state civil rights law. In addition, they allege the police actions comprise an intentional infliction of emotional distress, libel and abuse of process.

Plaintiff Carolyn Britton, Britton's wife, alleges a claim for loss of consortium.

Before me is the motion of defendant Roache, in his individual and official capacities, and defendant Flynn, in his official capacity, and the City of Boston ("the moving defendants") to dismiss the claims against them.[1] The complaint charges these defendants with liability under 42 U.S.C. § 1983, and M.G.L. ch. 12 § 11I. They contend that plaintiffs have failed to state a claim upon which relief can be granted.

## II. FACTS

The plaintiffs have alleged the following facts, which I must take as true for the purposes of this motion: Plaintiff Randy Britton is an African–American man, and a graduate of West Point and the Harvard Business School. In June, 1990, while Britton was still a student at Harvard Business School, he was working as a Field Operations Supervisor for the 1990 Census. Britton had been hired, in part, to help complete census taking in certain housing projects in the Roxbury section of Boston, where census takers had been threatened with physical violence.

In order to protect himself, Britton carried an unloaded rifle, which he contends he was entitled to do under Massachusetts law.[2] On June 30, 1990, while en route to the Regional Census Headquarters, Britton and his five year old daughter were chased in their car by two individuals apparently known to Britton: Tammy Loughlin and Tyrone Stampley. Britton and his daughter drove to the Boston Police Headquarters, which was a few blocks away.

Britton left his car unlocked in the middle of the street, and took the barrel and action portion of his rifle, and his daughter, into the police station. Britton told the duty officer that he was being chased by two individuals. Shortly thereafter, defendant Edward J. Dooley, a Boston police detective and member of the Drug Control Unit ("DCU"), arrived on the scene. Britton told him that people outside were trying to kill him. Dooley took Britton's rifle, and went outside where he spoke with Loughlin.

Britton next spoke with defendant Patrick J. Maloney, also a Boston police officer and member of the DCU. Maloney told him that the police were going to keep Britton's gun until they could determine whether he legally possessed it. Britton tried, without success, to explain that he was licensed to carry a rifle.

The officers asked Britton where the rest of the gun was, and he told them it was in the car and that the clip was in his pocket. The police proceeded to drive Britton's car out of the street, search it, take the rifle stock out of the car, and remove the rifle clip from Britton's pocket. The officers told Britton that he could retrieve the rifle in a few days after it had been examined by the police ballistics laboratory.

Britton then departed the police station. He was extraordinarily upset, because he felt like he had been treated as if he were a criminal, rather than a victim. That evening, Britton called the police station to complain about his treatment. He spoke with defendant Maloney, and told him that the seizure of his rifle was illegal, and that he (Britton) did not want to have to sue him to get it back.

---

1. Defendants' counsel contends that Mayor Flynn, currently the United States Ambassador to the Vatican, was never properly served in his individual capacity. Plaintiffs have not contested this claim.

2. Under Massachusetts law, a "firearm" has a barrel length of less than 16 inches, whereas a "rifle" must have a barrel length of greater than 16 inches. M.G.L. ch. 140 § 121. Ownership of a rifle or a firearm in Massachusetts requires possession of a "Firearm Identification Card." ("FID") *See* M.G.L. ch. 140 §§ 129B, 129C. Possession of a firearm, however, requires, in addition to an FID, a special license issued by local municipal authorities upon a background check of the licensee.

   Britton contends that he possessed an FID at the time of this incident, and that the gun he carried was a rifle.

On July 3, 1990, Britton went to the police ballistics lab to check on the status of his rifle. He was told that no such rifle had been delivered to the lab. Britton then travelled to Boston Police Headquarters, and spoke with defendant James W. Wood, a Deputy Superintendent in charge of the DCU. Wood refused to listen to his complaints. While Britton was trying to talk to Wood, Maloney arrived and advised Britton for the first time that he would be filing criminal assault charges against him, for allegedly pointing his rifle at Stampley and Loughlin.

Britton contends that these charges were totally false. Appended as an exhibit to his complaint is an affidavit from Tyrone Stampley stating as much. Britton also alleges that Tammy Loughlin reported to him that she never saw Britton's gun until he was already in the police station. Britton contends that the police covered up this lack of evidence by destroying an earlier version of the incident report which defendant Dooley had filed, a report which contained no mention of allegations against Britton.

On September 25, 1990, the criminal charges which had been filed against Britton were dismissed for want of prosecution after Stampley and Loughlin refused to testify. Britton's rifle was then returned to him, although he alleges it was damaged while in police custody.

Britton contends that as a result of the criminal charges which had been filed against him, he lost a high paying job with the securities firm of Donaldson, Lufkin and Jenrette ("DLJ") in New York City. In particular, he states that the firm withdrew an earlier offer to him of a position as a securities dealer after it discovered that he had not reported these assault charges on a securities dealer registration form. Although Britton later settled with DLJ, he claims that this incident ruined his potential career as a securities dealer because federal regulatory agencies have the authority to withhold securities dealer registration from any person charged with a felony, even if not convicted.

## III. STANDARD OF REVIEW

■ It is not proper to dismiss a complaint under Fed.R.Civ.P. 12(b)(6) unless "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984).[3]

■ In making this determination, a court should accept the well-pleaded complaint as true and indulge every reasonable inference in favor of the plaintiff. *Correa-Martinez v. Arrillaga–Belendez*, 903 F.2d 49, 52 (1st Cir.1990). This standard of review "does not mean, however, that a court must (or should) accept every allegation made by the complainant, no matter how conclusory or generalized." *U.S. v. AVX Corp.*, 962 F.2d 108, 115 (1st Cir.1992). "[A] reviewing court is obliged neither to credit bald assertions, periphrastic circumlocutions, unsubstantiated conclusions, or outright vituperation, nor to honor subjective characterizations, optimistic predictions, or problematic suppositions. Empirically unverifiable conclusions, not logically compelled, or at least supported, by the stated facts, deserve no deference." *Id.* (citations and internal quotations omitted). *Pro se* complaints, such as the instant one, are, however, held to a less stringent standard than formal complaints drafted by lawyers. *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972).

## IV. ANALYSIS

### A. Section 1983 Claims

It is apparent that, at least with respect to certain individual police officers named in the complaint, plaintiffs have alleged, with more than adequate detail, serious misconduct. The Court is especially troubled by the allegation, apparently supported by affidavit, that Boston police officers fabricated felony charges against Randy Britton.

Whether or not plaintiffs' allegations amount to federal constitutional violations is

---

**3.** This standard applies equally to a Section 1983 action against a municipality as to any other. *Leatherman v. Tarrant County Narcotics Intelli-* *gence and Coordination Unit,* 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993).

a more difficult issue. *See Albright v. Oliver,* —— U.S. ——, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (concluding there is no substantive constitutional due process right against malicious prosecution, although there may be one under Fourth Amendment analysis); *Pérez–Ruiz v. Crespo–Guillén,* 25 F.3d 40, 43 (1st Cir.1994) (existence of adequate state law remedy for malicious prosecution bars federal claim). It is an issue, however, that is not currently before me. Defendants' motion asks the Court to determine solely whether, assuming that Randy Britton's rights were violated by certain Boston police officers, plaintiffs' have alleged sufficient facts to find the moving defendants liable as a result.

■ Claims against a public official in his or her official capacity are treated as claims against the public entity he or she represents. *Kentucky v. Graham,* 473 U.S. 159, 165–166, 105 S.Ct. 3099, 3104–3105, 87 L.Ed.2d 114 (1985). Thus, the claims against Flynn and Roache in their official capacities are, in effect, claims against the City of Boston. *See Stratton v. City of Boston,* 731 F.Supp. 42, 46 (D.Mass.1989). By contrast, a claim against Roache in his individual capacity entails the showing of "an affirmative link" between his conduct and that of the lower ranking officers who allegedly violated Britton's constitutional rights. *See Voutour v. Vitale,* 761 F.2d 812, 819–820 (1st Cir.1985) *cert. den.* 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 916 (1986).

### 1. Claims Against the City of Boston
#### a. Principles of Municipal Liability

■ In the landmark case of *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held for the first time that municipalities could be sued under Section 1983. The Court went on to say, however, that the common law doctrine of *respondeat superior,* whereby employers are held vicariously liable for the wrongful acts of their employees, is not applicable to such actions. *Monell,* 436 U.S. at 692, 98 S.Ct. at 2036. Rather, a municipality may be liable under

Section 1983 only if there is a showing that a "policy or custom" of the municipality caused a constitutional tort. *Monell,* 436 U.S. at 694, 98 S.Ct. at 2037.

■ As with any other tort claim, there must be a showing in a Section 1983 action of "a direct causal link" between the municipal policy or custom and the alleged constitutional deprivation. *Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412 (1989). Since causation is not so much an objective fact as it is a legal conclusion, *cf. Palsgraf v. Long Island Railroad Co.,* 248 N.Y. 339, 162 N.E. 99 (1928), courts attempting to apply *Monell* have struggled to determine just which sorts of municipal wrongdoing may properly be said to have caused constitutional violations. *See Canton,* 489 U.S. at 385–386, 109 S.Ct. at 1203 (noting that this inquiry has left the Supreme Court "deeply divided").[4] Nonetheless, it is possible to make some general observations about the contours of municipal liability.

The clearest ground for municipal liability is the enforcement by the municipality of an unconstitutional ordinance, regulation, or written policy. *See Pembaur v. City of Cincinnati,* 475 U.S. 469, 480, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986).

■ A more common, and conceptually problematic, scenario is one where unwritten or informal municipal policies produced the constitutional violation at issue. In such situations, it may be difficult to distinguish an official policy from simply a pattern of behavior by municipal employees. The Supreme Court has made it clear that for a policy to exist, it must be the result of a "deliberate choice to follow a course of action … from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur,* 475 U.S. at 483–484, 106 S.Ct. at 1300–1301.

■ Still more amorphous is the concept of an unconstitutional "custom." A municipality may be liable for an unconstitutional

---

4. *See also Oklahoma City v. Tuttle,* 471 U.S. 808, 823, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985) ("Obviously, if one retreats far enough from a constitutional violation some municipal 'policy' can be identified behind almost any such harm inflicted by a municipal official …").

municipal custom if it is "so well-settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet [do] nothing to end the practice." *Bordanaro v. McLeod,* 871 F.2d 1151, 1156 (1st Cir. 1989) *cert. den.* 493 U.S. 820, 110 S.Ct. 75, 107 L.Ed.2d 42 (1989). Unlike a "policy", which comes into existence because of the top-down affirmative decision of a policymaker, a custom develops from the bottom-up. Thus, the liability of the municipality for customary constitutional violations derives not from its creation of the custom, but from its tolerance of or acquiescence in it. *Id.*

■ Perhaps the most attenuated causal connection which results in municipal liability in a Section 1983 case arises in so-called "failure to train" cases. This category overlaps with the three mentioned above, since a failure to train employees can, presumably, be the product of a written or unwritten policy, or of a municipal custom. Moreover, the existence of an unconstitutional municipal custom may create a need to train employees how to behave constitutionally. *See Canton,* 489 U.S. at 390, n. 10, 109 S.Ct. at 1205, n. 10; *Bordanaro,* 871 F.2d at 1155–1163. What distinguishes "failure to train" cases, however, is that there need not be a systematic unconstitutional practice (i.e. a policy or a custom) for liability to attach. Rather, liability results when 1) there is a constitutional violation by a municipal employee and 2) that violation can be said to have been caused by a lack of proper training. *See Collins v. City of Harker Heights,* 503 U.S. 115, 122–125, 112 S.Ct. 1061, 1067–1068, 117 L.Ed.2d 261 (1992).

Because of the open-ended nature of judgments about the appropriate level of training for municipal employees, the Supreme Court has expressed a concern that failure to train actions "would open municipalities to unprecedented liability under § 1983." *Canton,* 489 U.S. at 391, 109 S.Ct. at 1206. Accordingly, the Court has limited failure to train liability to the most egregious cases. A municipality will be held liable only if its failure to properly train evidences a "deliberate indifference" to the rights of its inhabitants. *Id.* at 389, 109 S.Ct. at 1205.

### b. *Plaintiffs' Allegations*

According to the complaint, the City of Boston caused the alleged violations of Randy Britton's constitutional rights by doing the following:

1) promulgating an unconstitutional written policy of seizing all firearms, rifles or shotguns which come into the possession of a Boston Police Officer;

2) failing to properly train and discipline the police force, leading police officers to believe that "they could arbitrage the perceived credibility gap between themselves and the City's African–American citizens" in such a way as to permit them to file false retaliatory criminal charges against those who had the courage to complain;

3) failing to have appropriate supervisory personnel in place, leading DCU squad leaders, such as defendant Maloney, "to become little Hitlers running amuck and doing their own thing";

4) maintaining an informal policy, at the behest of Mayor Flynn, of ignoring constitutional safeguards in order to maximize the number of arrests;

5) failing to properly train members of the DCU how to identify the types of assault weapons used by drug dealers, and how to distinguish them from rifles such as the one confiscated from Britton;

6) failing to promulgate a policies and procedures manual, and failing to distribute the Police Department manual of rules and regulations to individual officers;

7) failing to implement a department-wide performance appraisal system as mandated by state law;

8) failing to screen new police recruits for cultural biases;

9) failing to properly investigate complaints of police misconduct made to the Police Department's Internal Affairs Division;

10) failing to monitor and evaluate the performance of police officers with established patterns of misconduct;

11) permitting the existence of a Police Department "code of silence" whereby police

officers would refuse to testify to acts of misconduct against their fellow officers;

12) refusing to discipline Boston police officers who engaged in a pattern and practice of unconstitutionally searching and seizing African–American males, or to order it stopped.

### c. *Sufficiency of the Allegations*

### (1) *The Firearms Seizure Rule*

Rule 311 of the Boston Police Department Rules and Regulations states the procedure which Boston police officers must follow "[w]henever a firearm comes into the possession of a police officer, while on duty, by whatever means ..." In essence, Rule 311 requires that a police officer who comes into possession of a firearm must complete an incident report, and submit the firearm to the Boston Police Department Ballistics Unit. The Ballistics Unit is charged with maintaining custody of a seized firearms until it is returned to its owner or destroyed by court order.

Plaintiffs contend that Rule 311 is unconstitutional, since it requires police officers to seize any firearm which "comes into [their] possession", even when there is no probable cause for such a seizure. Moreover, they contend that Randy Britton suffered harm as a direct result of this policy because it resulted in the unconstitutional seizure of his rifle by Boston police officers.

I have examined the text of Rule 311, and find it ambiguous with respect to the issue raised by plaintiffs. It is true, as plaintiffs contend, that the rule is written in a very general way, to cover all instances in which a police officer comes into the "possession" of a firearm. The word "possession" is never defined, however, and it is unclear whether it refers to situations in which the officer has already seized a weapon based on probable cause, or whether it is meant to cover any circumstance in which an officer comes into physical control over a gun.

There is some suggestion in the text of the Rule that it was not meant to override an officer's discretion in determining whether a weapon should be seized. Section 8 of Rule 311 provides a procedure for handling firearms which are seized from licensed owners.

It describes the reasons for such a seizure as follows: "From time to time, police officers find it necessary to remove a firearm from the possession of an individual properly licensed to carry a weapon, e.g., a properly licensed individual being armed with a firearm is taken into custody because he is incapacitated through the use of alcoholic beverages, or if a properly licensed individual displays a firearm and threatens another person, etc."

This language suggests that the Rule envisions the seizure of firearms only when police officers "find it necessary to remove" them from their owners, rather than as a matter of course. In any event, I need not make a definitive interpretation of Rule 311 here. The issue is whether the Rule, as it is applied in practice by the Boston police department, caused the seizure of Randy Britton's firearm for unconstitutional reasons. That is a question of fact which, on the basis of the pleadings before me, I am unwilling to foreclose at this juncture.

### (2) *Acquiescence in or Condonation of Unconstitutional Practices by Boston Police Officers*

A second category of plaintiffs' claims against the City involve the City's alleged acquiescence in or condonation of unconstitutional practices by Boston police officers. In particular, plaintiffs contend that the City had an informal policy of encouraging Boston police officers to ignore the constitutional rights of citizens, particularly African–Americans, that the City was, in any event, aware that police officers systematically ignored the rights of African–Americans and did nothing to stop it, that the City refused to properly discipline officers who engaged in misconduct against civilians, and that the City permitted the existence of a customary department-wide "code of silence", intended to shield the illegal acts of police officers from scrutiny.

The City contends that these allegations are insufficient to survive a motion to dismiss because the complaint contains no factual claims which demonstrate a causal link between these allegations and the violation of Randy Britton's constitutional rights. Such

detailed factual allegations are, however, not required for a complaint to withstand a motion to dismiss. All that is required is a short and plain statement which gives the City fair notice of plaintiffs' claims, and the grounds therefor. *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, ——, 113 S.Ct. 1160, 1163, 122 L.Ed.2d 517 (1993); *McGrath v. MacDonald,* 853 F.Supp. 1, 4–6 (D.Mass. 1994).

Here the complaint is replete with allegations which, if true, could be said to have caused the conduct complained of here. For example, if it is true, as plaintiffs allege, that Boston police officers were encouraged or permitted, as a matter of policy to ignore the constitutional rights of suspects or of African–Americans, such encouragement or permission may well have been a cause of the incidents of which plaintiffs complain. *See Bordanaro,* 871 F.2d at 1155–1157; *Curran v. City of Boston,* 777 F.Supp. 116, 120–121 (D.Mass.1991); *Andujar v. City of Boston,* 760 F.Supp. 238, 242 (D.Mass.1991). Similarly, if the City refused or failed, in a systematic way, to discipline officers who committed unconstitutional acts, such a refusal or failure, depending on the circumstances, could rise to the level of an actionable policy or custom under Section 1983. *Bordanaro,* 871 F.2d at 1160.

Defendants contend that plaintiffs' claims must be dismissed because they speak too generally about the existence of unconstitutional policies and customs, and fail to describe more than a single incident of violations of constitutional rights by police officers which would demonstrate the existence of such. This contention is wrong both as a matter of fact, and of law. Plaintiffs have not simply imagined that there might be systematically flawed policies and customs behind the incidents of which they complain. Their allegations of unconstitutional policies are based largely on the conclusions of the so-called "St. Clair Report", an independent review of the Boston Police Department conducted at the request of Mayor Flynn. In addition, plaintiffs cite to numerous newspaper articles which suggest other, similar, incidents of misconduct by members of the DCU, and to a list of allegations made to the Massachusetts Attorney General's office concerning allegedly unlawful searches conducted by the Boston Police Department. Although neither the report nor the newspapers articles nor the allegations made to the Attorney General are admissible evidence in this case, they do indicate that plaintiffs' allegations are more than speculative fantasies.[5] *Cf. Alves v. Lemoure,* 794 F.Supp. 34, 36 (D.Mass.1992) (holding under pre-*Leatherman* heightened pleading standard that generalized allegations were sufficient where plaintiff has a reasonable basis to believe that particulars to support his allegations will be revealed through discovery).

Plaintiffs are not required, at this stage of litigation, to provide detailed proof that the City's policies caused specific acts which harmed them. The purpose of the complaint is not to prove that the plaintiffs have a factual basis for their claim. It is to put the defendants on notice as to the nature of their claim, and to permit them to prepare a defense. The complaint in this case satisfies that standard. Indeed, to hold the plaintiffs in a civil rights case to a higher standard would raise even more serious concerns than in the usual case. It would make it virtually impossible for the existence of unconstitutional policies such as those alleged by plaintiffs ever to be proven in court, since the victims of such policies are unlikely to be privy to facts sufficient to connect the policy to specific acts prior to discovery.

■ Finally, plaintiffs need not prove that more than one constitutional violation took place to prove that City policies or customs caused the alleged violations at issue here. *Pembaur v. Cincinnati,* 475 U.S. at 483–484, 106 S.Ct. at 1300–1301. They must only prove the existence of a policy or custom, and its causal relationship to the violation of Randy Britton's constitutional rights.

---

**5.** Of course, to defeat a motion for summary judgment, plaintiffs will be required to prove not only that such policies or customs existed, but that the City is responsible for them as a matter of law, and that they did, in fact, cause the unconstitutional behavior alleged in this case.

### (3) *Failure to Train*

Plaintiffs also allege that the City is liable because it failed to properly train police officers in their constitutional obligations to the public. Defendants object that plaintiffs allegations do not prove that the alleged lack of training was the result of "deliberate indifference" to the constitutional rights of person who deal with the police. For the reasons stated above, this objection is misplaced. Plaintiffs have a burden to produce evidence to prove that the City was deliberately indifferent in its failure to properly train, but they need not do so to defeat a motion to dismiss. *Leatherman,* 507 U.S. at ——, 113 S.Ct. at 1163; *McGrath,* 853 F.Supp. at 4–5; *Curran,* 777 F.Supp. at 120–121.

### 2. *Claims Against Defendant Roache*

As explained above, an individual may be held liable in a Section 1983 action only when the plaintiff shows "an affirmative link" between the individual's actions and a constitutional violation. *Voutour,* 761 F.2d at 819–820. In the case of a supervisory official, such action may consist of direct infringement of an individual's rights, or of "encouragement, condonation, or acquiescence or gross negligence amounting to deliberate indifference" to constitutionally improper behavior on the part of subordinates. *Lipsett v. University of Puerto Rico,* 864 F.2d 881, 902 (1st Cir.1988).[6] Mere negligence is insufficient. *Febus–Rodriguez v. Betancourt–Lebron,* 14 F.3d 87, 91–92 (1st Cir.1994).

Here the complaint alleges that Commissioner Roache promulgated or endorsed the allegedly unconstitutional policy of seizing all firearms which come into the possession of Boston police officers. The complaint also alleges that Commissioner Roache was aware of, and condoned, an unwritten policy or custom of the Boston police department of ignoring the constitutional rights of criminal suspects and African–Americans, particularly with respect to searches and seizures, as well as the unwritten policy or practice of the "code of silence"

among Boston police officers. All of these allegations are sufficient to state a claim under Section 1983. *Bordanaro,* 871 F.2d at 1163.

### B. *Claims Under M.G.L. ch. 12 § 11I*

M.G.L. ch. 12 § 11I, the Massachusetts Civil Rights Act, creates a cause of action against those who, "by threats, intimidation or coercion" interferes with another's exercise or enjoyment of the rights secured by the constitution or law of the United States or the Commonwealth of Massachusetts. As with Section 1983 actions, the doctrine of *respondeat superior* does not apply. A claim will lie only if defendant's actions directly caused harms actionable under the statute. *See Lyons v. National Car Rental Systems, Inc. (of Delaware),* 30 F.3d 240, 245–246 (1st Cir.1994).

In contrast with Section 1983, the cause of action under M.G.L. ch. 12 § 11I has an added element of "threats, intimidation or coercion," which narrows its scope. *See, Wynne v. Tufts University School of Medicine,* 932 F.2d 19, 28–29 (1st Cir.1991) (en banc). *Broderick v. Roache,* 803 F.Supp. 480, 484–485 (D.Mass.1992) (municipality may be held liable for policy or custom which results deprivation of plaintiff's rights through threats, intimidation or coercion). A direct violation of civil rights is not, without a showing of coercive behavior, actionable. *Longval v. Commissioner of Correction,* 404 Mass. 325, 333, 535 N.E.2d 588 (1989); *but see, Commonwealth v. Adams,* 416 Mass. 558, 624 N.E.2d 102 (1993).

The moving defendants claim that plaintiffs' claim under Section 11I should be dismissed because it fails to allege a threat, intimidation or coercion in the violation of Britton's rights. Coercion, though a necessary element of a Section 11I action, need not be explicit. In *Batchelder v. Allied Stores Corp.,* 393 Mass. 819, 823, 473 N.E.2d 1128 (1985), for example, a uniformed private security officer who ordered the plaintiff to stop distributing handbills, was held to be in violation of his rights under Article 9 of the

---

**6.** Such a showing requires, of course, that the individual defendant have been literally or con-

structively aware of the behavior in the first place. *Lipsett,* 864 F.2d at 902.

Declaration of Rights of the Massachusetts Constitution. While the plaintiff complied with the officer's orders without further physical confrontation, the Court held that the guard's order constituted a sufficient threat, coercion or intimidation to satisfy that element of a claim under Section 11I. *Id.*

In the instant case, the facts described in the complaint make it clear that, at least with respect to the seizure of Britton's rifle, Britton's cooperation with the police was involuntary, and was elicited through the intimidation of the police. The complaint specifically states that Britton did not wish to give up his gun, but was ordered to do so by the police. At this preliminary stage, these allegations are sufficient to satisfy the requirement under Section 11I that the violation of rights occur through threat, coercion or intimidation. *Id.*

## V. *CONCLUSION*

For the foregoing reasons, defendants' motion to dismiss is **DENIED.**

**SO ORDERED.**