**Timothy CARROLL, Plaintiff,**

v.

**CITY OF QUINCY et al., Defendants.**

**Civil Action No. 03–10317–NMG.**

United States District Court,
D. Massachusetts.

June 9, 2006.

Jessica Diane Hedges, Michael L. Tumposky, Stephen B. Hrones, Hrones Garrity and Hedges LLP, Boston, MA, for Plaintiff.

Audrey E. Cosgrove, Office of the City Solicitor, Monica E. Conyngham, City of Quincy—Solicitor's Office, William F. Sullivan, Sullivan and Associates, Rebecca L. Andrews, Murphy, Hesse, Toomey & Lehane, LLP, Quincy, MA, Richard C. Bardi, Michael P. Judge, Law Office of Richard C. Bardi, Robert M. Delahunt, Jr., William P Breen, Jr., Eckert Seamans Cherin & Mellott, LLC, Boston, MA, for Defendants.

### MEMORANDUM & ORDER

GORTON, District Judge.

Plaintiff Timothy Carroll ("Carroll") brings suit against the City of Quincy ("the City"), and Quincy police officers John Keenan ("Keenan"), Richard Bergeron ("Bergeron"), William Horick ("Horick") and Michael Kelly ("Kelly") (collectively "the defendants") alleging negligence and violations of his federal and state civil rights. Defendants move for summary judgment.

### I. *Factual Background*

On January 13, 1995, at 2:10 a.m., Carroll and an accomplice named Sweeney were arrested by Horick and Kelly for assault and battery and kidnapping. The officers placed Carroll in handcuffs and into the police cruiser for transport to the Quincy police station. During the course of the arrest, Carroll was unsteady on his feet and had difficulty walking without assistance. The officers could smell alcohol on Carroll's breath and believed he was intoxicated.

Sergeant Richard Bergeron was the desk sergeant at the Quincy police station that early morning. Because another arrestee was being booked when Horick and Kelly arrived at the station with Carroll, plaintiff was placed in a holding area while he waited to be booked. When Carroll was placed in the holding area, his hands were handcuffed behind his back. There was one other arrestee, Robert McCambly, in the holding area at that time.

Soon thereafter, Officers Keenan and Stephen O'Brien ("O'Brien") opened the holding area door and ordered Carroll to come out to be booked. No sooner had the officers called for Carroll when plaintiff suddenly and quickly fell backwards and hit his head during his attempt to exit the holding area of his own volition. Keenan and an EMT rendered medical assistance to Carroll while Bergeron called an ambulance, which arrived in less than five minutes and transported him first to Quincy Hospital and then to Boston City Hospital to receive medical treatment for his injuries. It was later determined at the hospital that Carroll had a blood alcohol content of 0.37. Carroll allegedly sustained serious injuries including a subdural hematoma, traumatic brain injury, depressive illness and seizure disorder.

On January 13, 1998, the last day before the statute of limitations ran, Carroll filed suit against the City of Quincy in Norfolk Superior Court for negligence and for civil rights violations pursuant to 42 U.S.C. § 1983. The complaint was dismissed by the Superior Court on April 27, 1998, due to Carroll's failure to make service of process on the City. On October 9, 2002, Carroll, through new counsel, moved the state court to reinstate his complaint against the City. The motion was allowed on November 15, 2002. In January, 2003, Carroll filed an amended complaint which, for the first time, asserted claims against the officer defendants in addition to the City. The amended complaint states four Counts. Count I states a claim under the Massachusetts Torts Claims Act for negligence. Counts II and III are brought pursuant to

42 U.S.C. § 1983 against the officer defendants and the City, respectively. Count IV states a civil rights claim against all defendants pursuant to the Massachusetts Civil Rights Act, M.G.L. c. 12 § 11I.

The defendants have denied all liability and defendants Keenan, Horick and Kelly submit cross claims for indemnification, contribution and reimbursement of counsel fees and expenses against the City. On February 19, 2003, defendants Keenan, Horick and Kelly removed the case to this Court where it was assigned to Judge O'Toole.[1] The case was reassigned to this session on July 8, 2004.

Defendants Bergeron and O'Brien filed a motion for summary judgment on October 4, 2005, which was opposed by the plaintiff and is pending. On February 9, 2006, the remaining defendants, collectively, filed their own motion for summary judgment. Plaintiff moved to strike that motion on the ground that it was untimely. The Court denied that motion at a pretrial conference on February 23, 2006, and gave plaintiff three weeks to file his opposition. The defendants' motions for summary judgment raise similar arguments and, therefore, the Court will address them conjointly. Having now considered the memoranda in support of and opposition to the pending motions, the Court resolves them as follows.

## II. *Discussion*

### A. **Legal Standard**

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir.1991)(quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990)). The

burden is upon the moving party to show, based upon the pleadings, discovery and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A genuine issue of material fact exists where the evidence with respect to the material fact in dispute "is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court must view the entire record in the light most hospitable to the non-moving party and indulge all reasonable inferences in that party's favor. *O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir.1993). If, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate.

### B. **Analysis**

In the pending motions for summary judgment, the defendants argue: 1) the plaintiff's claim against certain defendants was not filed within the applicable statute of limitations period, 2) the plaintiff cannot show "deliberate indifference" to his medical needs by defendants thus undermining

---

**1.** The action was improperly removed to this Court because there was a failure of all defendants to join in the notice. Nevertheless, because a motion to remand was not made within 30 days after removal, the objection was waived. *See* 28 U.S.C. § 1447(c).

his § 1983 claim, 3) the defendant officers are entitled to qualified immunity and 4) the claim under the Massachusetts Civil Rights Act fails because there is no evidence that any defendants interfered with plaintiff's civil rights by means of threats, intimidation or coercion. The Court will address those arguments *seriatim.*

### 1. Statute of Limitations

■ Defendants argue that Carroll's claims are barred by the applicable statute of limitations. Carroll filed suit against the City on January 13, 1998, the final day before the three-year statute of limitations ran. That complaint was dismissed on April 27, 1998, because plaintiff had failed to make service of process on the City. More than four years later, on October 9, 2002, Carroll moved the state court to reinstate his complaint against the City, which the Court allowed. Subsequently, Carroll filed an amended complaint that added defendants Keenan, Bergeron, Horick and Kelly as well as O'Brien.[2] Defendants contend that Carroll should not be permitted to add the individual defendants eight years after the incident and five years after the statute of limitations ran.

This Court need not address the statute of limitations issue because it was resolved against the defendants on two previous occasions. First, the Massachusetts state court allowed Carroll to reinstate his complaint and to amend it to add the officer defendants. Later, defendants Keenan, Horick and Kelly moved to dismiss on statute of limitations grounds but Judge O'Toole denied the motion.

This session considers Judge O'Toole's ruling to be the law of the case. In *Harlow v. Children's Hospital,* the First Circuit Court of Appeals stated that the law of the case doctrine posits that

when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages of the same case.

432 F.3d 50, 55 (1st Cir.2005)(quoting *Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983)). Although the law of the case directs only the Court's discretion, *see id.,* this Court will not disturb Judge O'Toole's previous ruling because it is neither clearly erroneous nor does it work a manifest injustice.

### 2. Deliberate Indifference

#### a. Officer Defendants

■ Next, defendants contend that this Court should enter summary judgment in their favor with respect to the § 1983 claims because Carroll has produced no evidence that they were deliberately indifferent to any serious medical need that Carroll had while he was in custody. "Deliberate indifference" is a term traditionally associated with violations of the Eighth Amendment. Pretrial detainees are protected under the Due Process Clause of the Fourteenth Amendment rather than the Eighth Amendment but the standard to be applied is the same as that used in Eighth Amendment cases. *See Bell v. Wolfish,* 441 U.S. 520, 545, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)(stating that the Due Process Clause protections are at least as great as those under the Eighth Amendment). An alleged Eighth Amendment violation is analyzed within the framework laid out in *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

■ As a preliminary matter, a point of clarification is necessary. Defendants base their argument on the premise that

---

**2.** At a conference held on February 23, 2006, the parties agreed to dismiss O'Brien from this lawsuit.

Carroll alleges "deliberate indifference" to his serious medical needs and denial of medical care. Defendants proceed from that point to argue that intoxication is not a serious medical need. Defendants have misconstrued Carroll's claim. Denial of medical care is one kind of "deliberate indifference" claim that can be brought pursuant to the Due Process Clause. Here, Carroll alleges that the defendants failed to prevent harm from befalling him and exhibited deliberate indifference to his health and safety. That is a wider claim than a simple allegation of denial of medical care.

■ In the *Farmer* decision, the Supreme Court established that only "deliberate indifference" by prison officials to an inmate's health or safety was sufficient to establish liability. The test for such a violation has two prongs. First, the plaintiff must demonstrate that the deprivation alleged is, objectively, sufficiently serious. *Farmer*, 511 U.S. at 834, 114 S.Ct. 1970. Thus, for a claim based on failure to prevent harm, the plaintiff must demonstrate that he was incarcerated under conditions imposing a substantial risk of harm. *Id.* Second, the plaintiff must show that officials evinced "deliberate indifference" to his health or safety. *Id.*

The *Farmer* Court held that to establish "deliberate" conduct the prison official

> must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837, 114 S.Ct. 1970. As the First Circuit noted in *Giroux v. Somerset County*, 178 F.3d 28 (1st Cir. 1999),

> [t]his standard requiring an actual, subjective appreciation of risk, has been likened to the standard for determining criminal recklessness.

*Id.* at 32. Within that subjective framework, a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious but prison officials may respond that even if the risks were obvious to others, it was not obvious to them. *Id.; Burrell v. Hampshire County*, 307 F.3d 1, 8 (1st Cir.2002).

■ The Supreme Court defined the "indifference" element separately. As the First Circuit stated in a discussion of *Farmer:*

> Prison officials cannot be indifferent, of course, if they are unaware of the risk. But even if they are aware, they cannot be deliberately indifferent if they responded reasonably to the risk, even if the harm ultimately was not avoided. Conceivably, a response that was colorable and taken in good faith might still be enough to negate deliberate indifference even if it were inadequate from an objective standpoint (and thus negligent).

*Burrell*, 307 F.3d at 8 (internal citations omitted).

■ Deliberate indifference is a very high standard and a showing of mere negligence will not meet it. *See Estelle v. Gamble*, 429 U.S. 97, 105–06, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The Supreme Court has stated that deliberate indifference requires "more than ordinary lack of due care for the prisoner's interests or safety." *Whitley v. Albers*, 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986).

Applying the *Farmer* test to the facts of this case, the first prong is clearly met, namely that the deprivation alleged is objectively, sufficiently serious. Given that Carroll was intoxicated and had demonstrated difficulty standing without assistance, the decision to place him in a holding area with his hands cuffed behind his back put him in a situation where there was a substantial risk of harm.

On the second prong of the *Farmer* test, Carroll must demonstrate that defendants were deliberately indifferent to his health and/or safety. With respect to the "deliberate" element, Carroll has offered sufficient evidence that the individual defendants were aware of facts from which they could have reasonably inferred that a substantial risk of serious harm to Carroll existed.

In many ways, the risk to Carroll was, arguably, quite obvious. His blood alcohol content was later determined to be 0.37, an astonishing determination described by one defendant in a post-incident report as a "toxic level". He was, nevertheless, placed in a holding area with his hands cuffed behind his back and left to his own devices.

Even if, as defendants contend, plaintiff showed no obvious indications of his near-comatose condition, the chemical finding is enough to present a genuine issue of fact. Moreover, Carroll has offered sufficient evidence to raise a legitimate question about the degree of actual knowledge of each of the four individual officer defendants regarding his intoxication. For example, in a post-incident report, defendant Horick stated that Carroll was "highly intoxicated and extremely unsteady on his feet" when he and Kelly arrested Carroll. Horick stated that he "had to assist [Carroll] to the booking area due to his apparent high state of intoxication." In a post-incident interview with a lieutenant from Internal Affairs, Horick stated that Carroll had been extremely drunk, "drunk to the point of not knowing his name or being able to exit the car on his own", and was helped from the car, "one leg at a time". Horick also recalls telling the desk sergeant (apparently, defendant Bergeron) that he would have to book Carroll at a later time "when he knows his name." In a separate post-incident report, defendant Keenan spoke of Carroll's intoxicated state at the police station on the morning of January 13, 1995.

Notwithstanding Carroll's ability to satisfy the "deliberate" element for the purposes of getting past a motion for summary judgment, consideration of the "indifference" element is more complicated. Assuming defendants were aware of the risk to Carroll's health and/or safety, the remaining question is whether they responded reasonably to that risk, even if the harm was not avoided. If so, they cannot be held liable for deliberate indifference pursuant to § 1983.

There is compelling evidence that the defendant officers were attempting to balance competing concerns at the time of Carroll's arrival at the Quincy Police Station. For example, it is the normal practice of the Quincy Police Department to book and thoroughly search arrestees at the time of their arrival at the station and to remove handcuffs only after such procedures have been conducted. However, when Carroll arrived at the police station on January 13, 1995, there was a line at the booking desk and he could not be booked immediately. The police found themselves in a bind. Carroll needed to be placed in the holding area until he could be booked but until he was booked he couldn't be adequately frisked. Moreover, there is evidence that there was at least one other arrestee, McCambly, in the holding area at the time Carroll was brought in. If the police had uncuffed Carroll, placed him in the holding area and he had then assaulted McCambly in any way, the City and the individual officers could have faced a § 1983 action by McCambly alleging that they were deliberately indifferent to his health and safety.

Carroll was not the first arrestee to enter the Quincy Police Station in an intoxicated state. It would be unreasonable to expect the police to take every criminal

suspect who is under the influence of drugs or alcohol to a hospital emergency room or otherwise to coddle them during their detention. Nevertheless, given that Carroll has offered enough evidence to raise a fact question about the subjective knowledge of the officer defendants to his highly intoxicated state, it is at least suspect that they took no precautionary measures with respect to his health and safety. This is even more surprising in light of defendant Bergeron's deposition testimony that it was the usual practice to put an inebriated arrestee in a cell until such time as the arrestee sobered up and could be booked. Moreover, Bergeron noted that, in the majority of such cases, the cuffs would be taken off the arrestee unless he or she was acting violently.[3]

■■■ Defendants' affirmative defense of qualified immunity is also unavailing. Under the doctrine of qualified immunity:

> government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

*Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Defendants have the burden of establishing their entitlement to such immunity. *DiMarco–Zappa v. Cabanillas*, 238 F.3d 25, 35 (1st Cir.2001). The defendants are entitled to qualified immunity unless: 1) the plaintiff's allegations, if true, establish a constitutional violation, 2) the right was clearly established at the time of the alleged violation and 3) a similarly situated reasonable officer would have understood that the challenged action violated the constitutional right at issue. *Rodriguez–Marin v. Rivera–Gonzalez*, 438 F.3d 72, 83 (1st Cir.2006). For a plaintiff to defeat

qualified immunity, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

Unlike the subjective test for deliberate indifference in *Farmer v. Brennan*, the test for qualified immunity is objective. Under the test announced in *Harlow*, reasonableness is measured by an objective standard and arguments that the defendants desired to handle (or subjectively believed that they had handled) the incident properly are irrelevant. *See Anderson*, 483 U.S. at 641, 107 S.Ct. 3034. In determining whether defendants' conduct was objectively reasonable, defendants must demonstrate that similarly situated reasonable officers would have believed that their conduct comported with established legal standards. That would require a showing that the similarly situated officers were not deliberately indifferent to an excessive risk either because they thought that there was no excessive risk or because they thought that their response was adequate.

Given that deliberate indifference under *Farmer* requires actual knowledge or awareness on the part of the defendants, the officer defendants in this case are not entitled to qualified immunity if they were deliberately indifferent. That is because a reasonable officer could not believe that his actions comported with clearly established law if he also understood that there was an excessive risk to the plaintiff to which he did not adequately respond. Conduct that is deliberately indifferent to an excessive risk to Carroll cannot be objectively reasonable conduct. *See Carter v. City of Philadelphia*, 181 F.3d 339, 356 (3d Cir.1999); *Pelletier v. Magnusson*, 195

---

**3.** Although Carroll was arrested for a violent crime, there is no evidence that he acted violently either at the time of his arrest or during his time at the station.

F.Supp.2d 214, 241 (D.Me.2002); *Navedo v. Maloney*, 172 F.Supp.2d 276, 286–87 (D.Mass.2001). Because there is a genuine issue of material fact with respect to defendants' alleged deliberate indifference, they are not entitled to qualified immunity.

Thus, finding that defendants' affirmative defense of qualified immunity is unavailing and that a fact dispute exists with respect to 1) defendants' knowledge of Carroll's highly intoxicated state and 2) the reasonableness of defendants' response to the risks posed by Carroll's state, Carroll has proffered sufficient evidence to withstand the motion for summary judgment on Count II against the officer defendants.

### b. City of Quincy

█ In Count III of the amended complaint, Carroll asserts a § 1983 claim against the City. The complaint states simply that the City's

custom and policy of handcuffing prisoners put in cells, and in particular those under the influence and unstable, caused the injury to Carroll.

Despite that minimal allegation, Carroll has proceeded to argue in his opposition to summary judgment that the City is liable for violating plaintiff's constitutional rights on four grounds: 1) the City's custom of placing handcuffed, intoxicated detainees in the holding area, 2) the City's failure to have a clear policy with respect to the proper use of restraints and the proper handling of intoxicated detainees, 3) the City's failure to train its officers in the proper use of restraints and the proper handling of intoxicated detainees and 4) the City's failure to investigate adequately the subject violations.

Of those grounds, the defendants were given notice by Carroll's complaint of only the first two. Based on Carroll's complaint, defendants had no way of knowing that Carroll intended to allege failure to train or failure to investigate as grounds for his municipal liability claim. Although Fed.R.Civ.P. 8(a) presents a liberal pleading standard, Carroll's pleading of municipal liability did not have even the minimal degree of particularity to alert defendants to the fact that failure to train and failure to investigate were among his allegations.

Thus, it is not surprising that defendants' motion for summary judgment did not mention anything about such allegations. In fact, the first time this Court or defendants learned of such allegations was in Carroll's opposition brief. Carroll's complaint states succinctly that his municipal liability claim is based on the City's "custom and policy of handcuffing prisoners put in cells", particularly intoxicated and unstable prisoners. He cannot now add new layers to his claim when this case stands just weeks from trial. The Court will address Carroll's opposition brief only to the extent that it concerns the City's custom and policy with respect to handcuffing intoxicated or unstable prisoners.

█ Turning to the applicable legal standard, no liability attaches to a governmental agency pursuant to a mere *respondeat superior* theory. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Rather, there must be "a direct causal link" between a municipal policy or custom and the alleged constitutional deprivation. *Britton v. Maloney*, 901 F.Supp. 444, 449 (D.Mass.1995)(citing *City of Canton v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). For a plaintiff to prevail on a claim of municipal liability under § 1983, he must establish 1) there existed a municipal custom or policy of deliberate indifference to the commission of constitutional violations and 2) that custom or policy was the cause of, and moving force behind, the particular constitutional deprivation of which he is complaining.

*Foley v. City of Lowell,* 948 F.2d 10, 14 (1st Cir.1991)(citing *Bordanaro v. McLeod,* 871 F.2d 1151, 1156 (1st Cir.1989)).

 Carroll first alleges that the City's custom of handcuffing intoxicated detainees and placing them in a cell caused the violation of his constitutional rights. At the time of Carroll's incident the City's official policy required that arrestees brought into the police station be booked upon arrival. During booking, the arrestee was required to be thoroughly searched at the booking desk after which his handcuffs or restraints were to be removed. The need for immediate booking is all the more important because the booking officer is required to evaluate the arrestee's condition and determine whether he is in need of medical attention. Moreover, the policy states that

> [p]risoners who are incapacitated from the use of alcohol or drugs ... shall at all times be incarcerated in a cell separate from any other prisoner.

Prisoners were to be handcuffed with their hands behind their back, palms facing outward, unless there were exigent circumstances "such as an injury etc." and, with respect to sick, injured or handicapped prisoners, the policy notes that arresting officers

> should apply handcuffs only if there is a threat of attack or injury to themselves or the prisoner. If handcuffs are required they should be used in a manner so as not to further aggravate the handicap or injury.

Upon consideration of the City's rather detailed written policies, this Court cannot comprehend how they implicate deliberate indifference by the City to the commission of constitutional violations. Carroll points to the testimony of defendant Keenan who stated that, "per dept [sic] policy", an intoxicated Carroll had been placed in the holding area (which was already occupied by another arrestee) with his hands hand-cuffed behind his back. Despite that testimony, it is clear that if such actions were taken by the individual officers, they were not undertaken pursuant to the City's policies because those policies prescribed precisely antithetical procedures.

Moreover, any such actions were not taken pursuant to an informal department custom because defendant Bergeron testified that if an arrestee was too intoxicated to be booked, it was the usual practice to put an inebriated arrestee in a cell until he/she sobered up and, during that period, the handcuffs would be removed unless the detainee was acting violently. Thus, if there was any deliberate indifference to Carroll's constitutional rights, it was not due to the City's policies but rather to the individual actions of the defendant officers who allegedly failed to follow those policies.

 Carroll next argues that the City failed to establish a clear policy regarding the proper handling of, or use of restraints with respect to, intoxicated detainees. That argument is similarly unpersuasive. Far from exhibiting deliberate indifference, the City's policies clearly delineate the proper procedures for 1) the use of restraints on intoxicated detainees and 2) the handling of such detainees. Whatever failures occurred at the Quincy Police Station on January 13, 1995, if any, they were not caused by deliberately indifferent policies of the City. Thus, Carroll's claim for municipal liability pursuant to § 1983 fails and summary judgment is appropriate on that claim.

### 3. Massachusetts Civil Rights Act Claim

 Carroll also alleges that defendants interfered with, or attempted to interfere with, his constitutional rights in violation of M.G.L. c. 12, § 11I, the Massachusetts Civil Rights Act ("the MCRA").

To establish a claim under the MCRA, a plaintiff must prove 1) his exercise or enjoyment of his rights secured by the Constitution or the laws of either the United States or the Commonwealth have been subjected to interference or attempted interference by the defendants and 2) that the interference or attempted interference was by "threats, intimidation or coercion". *Bally v. Northeastern Univ.*, 403 Mass. 713, 717, 532 N.E.2d 49 (1989). Those requirements under the MCRA are "coextensive with 42 U.S.C. § 1983, except that the Federal statute requires State action whereas its State counterpart does not." *Batchelder v. Allied Stores Corp.*, 393 Mass. 819, 822–23, 473 N.E.2d 1128 (1985).

■ Massachusetts case law defines a "threat" as "the intentional exertion of pressure to make another fearful or apprehensive of injury or harm." *Planned Parenthood League of Mass., Inc. v. Blake*, 417 Mass. 467, 474, 631 N.E.2d 985 (1994). Intimidation "involves putting in fear for the purpose of compelling or deterring conduct." *Id.* Coercion is "the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done." *Id.*

■ Here, Carroll alleges that all the defendants violated his civil rights by "threats, intimidation, and violence." As a preliminary matter, Carroll's MCRA claim against the City will not stand. In marked distinction to § 1983, Massachusetts courts have indicated that a municipality is not a "person" within the terms of the MCRA and, as such, cannot be sued under the statute. *See Howcroft v. City of Peabody*, 51 Mass.App.Ct. 573, 592–93, 747 N.E.2d 729 (2001). Thus, the City cannot be liable for a MCRA violation in this case.

■ Turning to the officer defendants, Carroll's argument for MCRA liability is also lacking. He has offered no evidence that the officer defendants interfered or attempted to interfere with his rights by means of threats, intimidation or coercion. A direct deprivation of rights, even if unlawful, is not coercive because it is not an attempt to force someone to do something the person is not lawfully required to do. *Freeman v. Planning Bd. of W. Boylston*, 419 Mass. 548, 565, 646 N.E.2d 139 (1995). Here, plaintiff's allegations can accurately be characterized as deliberate inattention to his health and safety needs. Deliberate inattention is the antithesis of threats, intimidation or coercion.

Carroll offers a cursory opposition to the motion for summary judgment on the MCRA claim which, in essence, contends that if his claims are strong enough to survive summary judgment on the § 1983 claims then they can sustain a challenge to the MCRA claim. That supposition effectively ignores the critical distinction between the two statutes, namely that a deprivation of constitutional rights under the state statute must be by means of threats, intimidation or coercion. Given the weak effort to support it, summary judgment is appropriate with respect to Carroll's MCRA claim (Count IV).

## ORDER

In accordance with the foregoing, Defendants Motions for Summary Judgment (Docket Nos. 41 and 53) are, with respect to the Massachusetts Civil Rights claim (Count IV), **ALLOWED**. The City of Quincy's Motion for Summary Judgment (Docket No. 53) with respect to § 1983 liability (Count III) is **ALLOWED**. Defendants' Motions for Summary Judgment (Docket Nos. 41 and 53) are, in all other respects, **DENIED**.

**So ordered.**